Subhash **SAHAI** and Webster
City Medical Clinic, Inc.,
Appellants,

v.

Stacey D. **DAVIES** and The Iowa Civil
Rights Commission, Appellees.

No. 95–1620.

Supreme Court of Iowa.

Jan. 22, 1997.

Joseph L. Fitzgibbons and David A. Lester of Fitzgibbons Brothers, Estherville, for appellants.

Thomas J. Miller, Attorney General, and Teresa Baustian, Assistant Attorney General, for appellees.

CARTER, Justice.

The appellants, Subhash Sahai, a physician, and Webster City Medical Clinic, Inc., a professional corporation for the practice of medicine, challenge the district court's order upholding a finding by the Iowa Civil Rights Commission that they were guilty of sexual discrimination in employment when, following a physical examination of a job applicant for a prospective employer, they recommended that a pregnant female applicant not be hired. Based on this finding, a monetary sanction of $11,000 plus interest was levied against appellants by the commission, and appellants were ordered to develop written policies concerning future recommendations to employers with respect to pregnant female applicants examined at the clinic at the employer's request.

This judicial proceeding is for review of agency action as provided in Iowa Code section 17A.19 (1995). The respondents in the district court and appellees in this court are the Iowa Civil Rights Commission and the complainant, Stacey D. Davies. After reviewing the record and considering the arguments presented, we reverse the judgment of the district court and the decision of the Iowa Civil Rights Commission.

The complainant, Stacey D. Davies, applied for work at the Nissen Company in Webster City in the summer of 1989. Nissen is a meat packing facility that does not have a kill floor. Work at that plant primarily involves packing smaller processed meats such as wieners or franks. Davies was interviewed for a position on the assembly line at Nissen on September 8, 1989.

The vice president of production determined that she was qualified for the job and advised her that she would be hired if she could pass a physical examination and drug test. The Nissen representative arranged for Davies to obtain a physical examination and drug test at the Webster City Medical Clinic. Pursuant to a contract with Nissen, the clinic regularly conducted physical examinations on prospective employees and provided Nissen with the results and recommendations concerning physical abilities to do the job. Davies was originally scheduled to see a Dr. Schoultz for her physical examination.

When she informed Dr. Schoultz that she was fourteen weeks into a pregnancy and that Dr. Sahai of the same clinic had delivered her first child, Dr. Schoultz thought it preferable to have Dr. Sahai perform the examination.

Dr. Sahai is a graduate of the University of Iowa Medical School and a board-certified family practice specialist. He performed a complete physical examination on Davies, including obtaining a current patient history concerning alcohol usage, allergies, potential pulmonary problems, fractures, mental disease, diabetes, kidney trouble, hearing difficulties, coronary condition, tumors, prior back pain, prior surgeries, and medications that Davies was then taking. Davies' blood pressure was taken and recorded, and a physical examination was completed as to height, weight, vision, hearing, cardiovascular sufficiency, and respiratory sufficiency. An abdominal examination was performed as well as genito-urinary, gastrointestinal, nervous system and joint examinations.

Upon completing the examination, Dr. Sahai completed a medical form evidencing the results and, in a space on that form that indicated whether Davies was approved for the prospective work, checked a box indicating "No." That recommendation was communicated to Nissen officials by telephone the same day. In this conversation, Dr. Sahai informed Nissen personnel employees that his decision was made with respect to assembly line work and indicated that Davies was physically able to perform less-demanding work if available. Dr. Sahai testified at the administrative hearing that a written report followed approximately two days later.

Acting on Dr. Sahai's oral report, Nissen Company personnel managers declined to hire Davies for the available assembly line position. No less physically demanding position was available at that time. Approximately three months after the birth of her child, Davies reapplied for work with Nissen and was hired as a packager of hot dogs. She worked in that position for approximately four months.

Davies filed a complaint against Nissen, the clinic, and Dr. Sahai, contending that her failure to obtain the assembly line position as a result of her pregnancy was an unlawful discrimination in employment based on sex. The issues involving Nissen are not involved on this appeal. With respect to the claims against the clinic and Dr. Sahai, an administrative law judge took evidence and filed a proposed decision finding that (1) not only employers but all entities that play a role in hiring decisions are subject to the statutory prohibitions against employment discrimination, (2) any classification based on pregnancy is a distinction based on sex, and (3) the only defense available to the clinic and Dr. Sahai was to show that absence of pregnancy was a bona fide occupational qualification for an assembly line position at Nissen.

With respect to the third point listed above, the hearing officer concluded that the clinic and Dr. Sahai failed to establish a job-related physical disqualification based on pregnancy because their concerns were not with plaintiff's ability to perform the work but rather with the incremental increase in the health risk to her from assembly line work as her stages of pregnancy progressed. This proposed decision was adopted as the final agency action in the case. After being reviewed by the district court pursuant to section 17A.19, the final agency order, including imposition of sanctions, was affirmed.

■ In challenging the orders of the Civil Rights Commission, the clinic and Dr. Sahai urge that their only role in the hiring process was to conduct a physical examination of a job applicant and report the results to the prospective employer together with an opinion concerning the applicant's physical ability to perform the particular job.[1] The employer, appellants argue, was free to treat that opinion as it wished for purposes of the hiring decision. They maintain that in such instances the responsibility to evaluate the impact of the civil rights laws on the ultimate hiring decision is the employer's responsibili-

1. For this purpose Dr. Sahai and other doctors at the clinic had visited the Nissen plant and familiarized themselves with the nature of the work for assembly line positions, as well as other positions.

ty and should play no role in a physician's formulation of a medical judgment.

In seeking to counter these arguments, the commission and Davies argue that the clinic's arrangement with Nissen placed it in a position to control the latter's hiring decisions. As a result, she urges, the clinic and its member doctors should be subject to sanction under the employment discrimination statutes (Iowa Code § 216.6(1)(a)) for recommendations that cause the employer to render discriminatory hiring decisions. We disagree with this contention.

The arguments that the commission and Davies set forth take note of the fact that the controlling statute, § 216.6(1)(a), prohibits "any person" from discriminating in employment based on sex rather than "any employer." Although we agree that this language extends the prohibition of the act to some situations in which a person guilty of discriminatory conduct is not the actual employer of the person discriminated against, it does not, in our view, embrace the actions of the clinic and Dr. Sahai in the present case. That is due to the fact that within the context of the Nissen hiring decision the clinic's role was advisory. The advice being sought was an independent medical judgment. Recommendations made in this context that are directly responsive to a prospective employer's request are not in our view discriminatory actions.

■ We reach the conclusion stated above as a matter of statutory interpretation in our review of agency action under Iowa Code section 17A.19(8)(a) (when the agency has violated a statute). Consequently, our task is to determine whether the district court's view as to the meaning of the statute accords with our own interpretation. *Davenport Bank & Trust Co. v. Iowa Dep't of Revenue,* 457 N.W.2d 610, 612 (Iowa 1990); *Iowa Auto Dealers Ass'n v. Iowa Dep't of Revenue,* 301 N.W.2d 760, 762 (Iowa 1981). Whether a particular state of facts fall under the statute

as interpreted by this court is an adjunct issue of statutory construction when that decision may be made by viewing the facts most favorably toward the opposing point of view.

■ The operative facts in the present dispute are such that it poses both sexual discrimination issues and physical disability issues. For this reason, we find that the conclusion of the commission that the case presents a straight bona fide occupational qualification issue is not well taken. As developed in our prior cases, the doctrine of bona fide occupational qualification has reference to general personnel policies applied to specific categories of employees. *See Quaker Oats Co. v. Cedar Rapids Human Rights Comm'n,* 268 N.W.2d 862, 867 (Iowa 1978); *Cedar Rapids Community Sch. Dist. v. Parr,* 227 N.W.2d 486, 496 (Iowa 1975). The present case, on the other hand, relates to an ad hoc evaluation of a single job applicant with respect to physical qualifications for job performance. Although we have recognized that "any classification which relies on pregnancy as a determinative criteria is a distinction based on sex," *Quaker Oats Co.,* 268 N.W.2d at 867, we have never indicated that physical disabilities caused by pregnancy, if shown to exist, may not be a factor in a hiring decision if the disability affects performance of the job. In order to determine whether this is the case with respect to a particular employee or prospective employee, an employer should be free to seek out expert medical opinion and those professionals asked to give such opinions should be free to make independent medical judgments.[2]

The commission believed that Dr. Sahai's recommendation was not an independent medical judgment concerning Davies because he candidly admitted during cross-examination that he would make the same recommendation against assembly line work for any prospective female employee in Davies' stage of pregnancy. We are convinced, however, that physicians regularly issue medical opin-

2. The commission believed that Dr. Sahai should not be able to use his right to make an independent medical judgment as a defense in this matter because there was no physician and patient relationship between him and Davies. Accepting the commission's conclusion that Davies was not

Dr. Sahai's patient, we nevertheless believe that Nissen, as the party that had contracted for Dr. Sahai's services, was entitled to his independent medical judgment, and he was entitled to give it that judgment.

ions based on typical prognoses for similarly situated clinical settings. This does not mean that such evaluations are not individualized when rendered with respect to a particular individual in connection with a physical examination of that person.

The commission also rejected Dr. Sahai's claim that he was only giving advice concerning Davies' ability to do the job because his recommendation that Nissen not hire her was based on his concern for the potential adverse physical consequences to Davies rather than her physical ability to perform the requirements of the job while pregnant. In this regard, the commission relied on the following observation in a federal court decision involving pregnancy discrimination:

> [The employer's] contention that an element of business necessity is its consideration for the safety of the pregnant [employee] and her unborn child is not persuasive. If this personal compassion can be attributed to corporate policy, it is commendable, but in the area of civil rights, personal risk decisions not affecting business operations are best left to individuals who are the targets of discrimination.

*Burwell v. Eastern Air Lines, Inc.*, 633 F.2d 361, 371 (4th Cir.1980).

The evidence does reveal that Davies' physical well-being was of paramount consideration in Dr. Sahai's recommendation and probably influenced him more than her potential ability to perform the physical tasks of assembly line work. This circumstance, however, only establishes that Dr. Sahai's opinion did not contain all of the information that Nissen would need in order to evaluate the potential employment discrimination aspects of its hiring decision. It does not mean that the potential health consequences to Davies were a matter of no concern to Nissen. This was information that Nissen could use in shaping Davies' job responsibilities if it did hire her. We believe it was the type of information that Dr. Sahai should have been free to include in his opinion.

It is perhaps unfortunate that the form of Dr. Sahai's written opinion was a conclusory recommendation as to whether Davies'

should be hired. The record indicates, however, that immediately following her physical examination, Dr. Sahai phoned a Nissen personnel representative and informed him that he did not believe a young woman who was fourteen weeks pregnant should be doing assembly line work. He emphasized that this was particularly true for a newly hired employee that had never done that type of work before. At this point, Nissen representatives were free to ask follow-up questions concerning whether Dr. Sahai's recommendation was based on his beliefs concerning Davies' ability to perform assembly line work or upon potential physical harm to her from doing that work. The fact that Nissen did not ask these follow-up questions and, as a result, might have violated employment discrimination laws, does not make Dr. Sahai's recommendation, based on health considerations, a sexually discriminatory act.

In reaching these conclusions, we have considered the line of cases decided under federal sex discrimination statutes that are commonly referred to as the "gatekeeper" cases. These cases are *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291 (11th Cir. 1988); *Pardazi v. Cullman Medical Center*, 838 F.2d 1155 (11th Cir.1988); *Doe v. St. Joseph's Hospital*, 788 F.2d 411 (7th Cir. 1986); and *Gomez v. Alexian Bros. Hospital*, 698 F.2d 1019, 1021 (9th Cir.1983). These cases involved alleged discriminatory practices in the denial of hospital staff privileges or residency status to physicians and thus foreclosing their employment by third persons. It was determined that the hospitals involved had by their actions violated federal employment discrimination laws even though they were not the actual employers of the complaining parties. In each of these cases, the alleged discriminatory acts were with respect to the national origin of the physician. The exercise of independent professional judgment by the hospitals alleged to have discriminated was not at issue. We find that these authorities offer no support for the commission's position in the present case.

As a final matter, we wish to note that our decision does not suggest that the clinic or Dr. Sahai are totally without responsibility for the recommendations that they make un-

der their agreement with Nissen. Their liability to Nissen, as the party that hired them, is established by the terms of the contract of hire. In addition, some authorities recognize that physicians employed by a prospective employer to examine a job applicant may be liable to that applicant if an inaccurate report injures the examinee's employment chances. *See* 61 Am.Jur.2d *Physicians, Surgeons, and Other Healers* § 297, at 446 (1981). We express no view concerning this type of liability in the present case because it exists, if at all, outside the ambit of the employment discrimination laws set forth in section 216.6. Because we find that the acts of the clinic and Dr. Sahai of which Davies complained provide no claim under that statute, we reverse the judgment of the district court and the decision of the Iowa Civil Rights Commission.

REVERSED.

All justices concur except HARRIS, J., who concurs in the result, and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ., who dissent.

LAVORATO, Justice (dissenting).

I. The majority concedes, as it must, that persons other than employers may be held liable under Iowa Code section 216.6(1)(a). The statute is abundantly clear on this point:

1. It shall be an unfair or discriminatory practice for any:

   *a.* Person to refuse to ... classify, or refer for employment ... any applicant for employment ... because of the ... sex ... of such applicant....

Iowa Code § 216.6(1)(a). A "person" includes, among others, "one or more individuals ... [and] corporations." Iowa Code § 216.2(11). Sahai and the clinic are "persons" within the meaning of this definition.

For the purposes of this statute "any classification which relies on pregnancy as the determinative criteria is a distinction based on sex." *Quaker Oats Co. v. Cedar Rapids Human Rights Comm'n,* 268 N.W.2d 862, 867 (Iowa 1978) (quoting *Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 166–168, 375 N.E.2d 1192, 1198–99 (1978)). Simply put,

pregnancy discrimination is equivalent to sex discrimination. *Id.; Cedar Rapids Community Sch. Dist. v. Parr,* 227 N.W.2d 486, 493 (Iowa 1975).

Davies applied for a job with Nissen. Nissen hired Davies on condition that she pass the physical examination and drug test. Clearly, Davies was an applicant for employment and Nissen was a prospective employer.

The commission found that Sahai refused to classify or refer Davies for employment because of her pregnancy, a discriminatory criterion. There is substantial record evidence to support this finding through Sahai's own testimony:

Q. In fact, you do have a blanket policy for permitting pregnant women to work on the assembly line, do you not? A. Well, you're correct. For the assembly line, yes, there is. If you want to call that a blanket policy, yes, I'll give in to that.

Q. It's your policy not to permit pregnant women to work on the assembly line for Nissen Company. That is your policy, isn't that correct? A. That's not correct. The policy is not to newly hire women who are pregnant for assembly line work.

Q. So, in essence, though when you are approving people for their pre-employment physical, that would be a newly hired person? A. That's correct.

Q. You would not approve someone for hire on the assembly line who is pregnant? A. That's correct.

Q. And the sole reason for that is the pregnancy, isn't that right, Doctor? A. And assembly line work.

Sahai based his policy on medical knowledge that anyone working on an assembly line had a higher likelihood of developing carpal tunnel syndrome and that pregnancy exacerbates this malady. The policy was also based on his knowledge that assembly-line work exacerbates back pain and joint pain associated with pregnancy.

As the majority points out, Sahai did a thorough physical examination. Following that examination, Sahai concluded Davies was a "healthy pregnant woman" who had

none of the maladies to which Sahai felt she might be prone in assembly-line work.

Nevertheless, Sahai told Davies he was going to recommend that Nissen not hire her. True to his word, Sahai telephoned Hakes, the individual who had interviewed Davies, and recommended against hiring Davies for assembly-line work because she was pregnant. Sahai also sent Nissen a physical exam record he had filled out on the day of the examination. To the question, "Approved for work?" on the form, Sahai responded, "No."

This evidence supports the commission's finding that Sahai refused to refer Davies for employment because she was pregnant and not because she was unable to do assembly-line work.

The majority puts a different spin on this evidence, stating Sahai's refusal to approve Davies for work was not discriminatory because his role was merely "advisory." But the commission found to the contrary and, as already illustrated, there is substantial evidence in the record to support this finding. The majority must engage in a de novo review to justify its conclusion that Sahai's recommendation was mere advice, a standard of review that is clearly inappropriate in this agency appeal. *See Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 908 (Iowa 1987) (holding that agency findings are binding on appeal unless a contrary result is demanded as a matter of law).

The crux of the majority opinion, however, is based on a mixed motivation theory. The majority states that Sahai's recommendation was based on two factors: Davies' physical well-being (a discriminatory criterion because based solely on Davies' pregnancy) and her ability to do the work (a nondiscriminatory criterion). The majority attempts to save Sahai from liability by putting the blame on Nissen for not asking the right questions: whether the recommendation was based on Sahai's beliefs concerning Davies' ability to perform assembly-line work or upon potential physical harm to her from doing that work because she was pregnant.

I think this reasoning is flawed for several reasons. First, what motivated Sahai's rec-

ommendation is a fact question. The commission found that the recommendation was based on a stereotypic and discriminatory belief that pregnant women should not do assembly-line work. The record contains substantial evidence to support this finding, a finding that is binding on us on appeal.

Second, the reasoning runs counter to the mixed motivation rule fashioned in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under this rule, the employee must first establish by a preponderance of the evidence that a discriminatory reason played a part in the employment decision. *Price Waterhouse*, 490 U.S. at 244, 109 S.Ct. at 1787, 104 L.Ed.2d at 285. The defendant's burden at this point "is most appropriately deemed an affirmative defense" rather than a shift in the burden of proof. *Id.* at 252, 109 S.Ct. at 1792, 104 L.Ed.2d at 289. If the defendant wishes to prevail, it must prove by a preponderance of the evidence that "its legitimate reason, standing alone, would have induced it to make the same decision." *Id.*

Stated in another way,

[w]hen a plaintiff ... proves that [a discriminatory reason] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [discriminatory reason] into account.

*Id.* at 258, 109 S.Ct. at 1795, 104 L.Ed.2d at 293. This approach is justified in mixed motivation cases because the defendant "has created uncertainty as to causation by knowingly giving substantial weight to an impermissible criterion." *Id.* at 261, 109 S.Ct. at 1796, 104 L.Ed.2d at 295 (O'Connor, Justice, concurring).

Assuming for purposes of argument that Sahai had a mixed motivation, as the majority suggests, he still loses because he made no showing before the commission that he would have made the same recommendation even if he had not taken the discriminatory reason into account. The majority turns the mixed motivation rule on its head because it shifts the burden to Davies to prove what substantially motivated Sahai's recommendation.

Even if the mixed motivation rule is not applicable, I think the result should be the same. The critical question is whether the discriminatory reason played a substantial part in Sahai's recommendation. Again, this is a fact question and inheres in the commission's finding that Sahai refused to classify or refer Davies for employment because of her pregnancy, a discriminatory criterion.

II. I think the commission's decision is also supported by a second theory the commission relied on: the "control over employment opportunities" theory of liability. The commission borrowed this theory from federal cases interpreting Title VII.

This theory is based on the rule that parties other than a plaintiff's actual potential employer can be liable under Title VII if such parties control the plaintiff's access to employment opportunities and interfere with that access for discriminatory reasons. The seminal case is *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973).

The rule is based on a broad interpretation of Title VII. *Pelech v. Klaff–Joss, LP,* 815 F.Supp. 260, 262 (N.D.Ill.1993). Title VII— the counterpart to our own employment discrimination statute—provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a)(1).

The interpretation that Title VII encompasses more than the traditional employer-employee relationship derives from the statute's use of the term "any individual," instead of employee. *Pelech,* 815 F.Supp. at 262–63. This interpretation is consistent with the purpose of Title VII:

[T]he Congressional objective in Title VII is "plain from the language of the statute," and that is "to achieve *equality of employment opportunities.* ..." In prohibiting discrimination in employment on the basis of sex, "one of Congress' main goals was to provide equal access to the job market for both men and women." Control over access to the job market may reside, depending upon the circumstances of the case in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on [invidious] grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service would be to condone continued use of the very criteria for employment that Congress has prohibited.

A fair reading of the Act in the light of its stated purposes precludes such result. ...

The Act defines "employee" as "an individual employed by an employer," but nowhere are there words of limitation that restrict references in the Act to "any individual" as comprehending only an employee of an employer. Nor is there any good reason to confine the meaning of "any individual" to include only former employees and applicants for employment, in addition to present employees. Those words should, therefore, be given their ordinary meaning so long as that meaning does not conflict with the manifest policy of the Act.

*Sibley,* 488 F.2d at 1340–41.

Liability under the rule turns on whether the defendant had control over the plaintiff's access to employment opportunities. On the control issue, the proper focus is on whether the defendant had the power to affect the plaintiff's access to employment opportunities and interfered with that access for discriminatory reasons. *Mitchell v. Tenney,* 650 F.Supp. 703, 706 (N.D.Ill.1986) (holding that analysis should focus on whether defendant had the power to affect plaintiff's access to employment opportunities in a discriminatory manner).

The commission borrowed this "control over employment opportunities" theory of liability in interpreting our own employment discrimination statute, and I think properly so. Tailored to Iowa Code section 216.6(1)(a) and the facts of this case, the claim for discrimination would be phrased this way:

> A person who controls an applicant's access to employment opportunities with a third party and who refuses to classify or refer the applicant for employment with the third party because of sex is liable to the applicant.

Under the "control over employment opportunities" theory, our focus should be on whether Sahai had the power to affect, that is, influence Nissen's decision to hire Davies. The factual scenario in *Association of Mexican–American Educators v. California*, 836 F.Supp. 1534 (N.D.Cal.1993), illustrates this point. In this case three associations and fifteen individuals brought a class action against the State of California and the California Commission on Teacher Credentialing (teaching commission). The lawsuit, premised in part on a violation of Title VII, challenged the use of the State's basic educational skills test (test) as a requirement for certification to teach in California public schools. The plaintiffs challenged the test requirement on the grounds it had a disparate impact on racial minorities.

Among other grounds for their summary judgment motion, the State and the teaching commission urged Title VII did not apply because local school districts, rather than the State and the teaching commission, directly employed the plaintiffs. The pivotal question was whether the State and the teaching commission, the entities responsible for the test requirement, could nevertheless be held liable under Title VII "because of the obstacle they placed in plaintiffs' path to employment" with the school districts. *Id.* at 1550–51. Relying on *Sibley*, the court held against the State and the teaching commission, stating significantly:

> There is no question but that under *Sibley*, defendants cannot escape Title VII liability solely because they are not plaintiffs' employers. While defendants are correct that passage of the [test] does not

guarantee a job (a successful applicant must be hired by the local school district), passing the test is the sine qua non of employment in California's public schools.

*Id.* at 1551.

The school districts had the ultimate say on whether the plaintiffs would be hired. Passing the test still did not guarantee a job. Nevertheless, the nonemployers (the State and the teaching commission) could incur Title VII liability because they required the plaintiffs (the applicants) to pass a discriminatory test before the school districts (the potential employers) could even consider the plaintiffs for employment. In short, the State and the teaching commission had the power to affect the plaintiffs' access to employment opportunities with the districts because passing the test was a necessary condition of employment with the districts.

Here, Davies was in a stronger position than the plaintiffs were in *Association of Mexican–American Educators*. Davies had the job, but there was one catch: She had to pass Sahai's physical examination and receive a favorable recommendation from him. Sahai had the power to affect Davies' conditional employment because passing the physical and receiving a favorable recommendation were the necessary conditions of Davies' employment with Nissen.

There is substantial record evidence to support the commission's findings that Sahai (1) had the power to affect Davies' access to employment opportunities with Nissen, and (2) interfered with that access for discriminatory reasons.

Hakes told Davies in her initial interview that she was qualified and offered her the job *conditioned on her passing the physical.* Sahai recommended that Nissen not hire her because she was pregnant. Based on Sahai's recommendation, Nissen did not hire Davies. On this last point, a commission investigator testified about her conversations with Hakes regarding Sahai's recommendations in general and his recommendation as to Davies in particular. Hakes unequivocally attributed Nissen's refusal to hire Davies directly to Sahai's recommendation:

Q. In your questioning of Mr. Hakes, did you inquire of him as to why he did not hire or Nissen Company did not hire Ms. Davies? A. Yes.

Q. What was his response to you? A. He said that Dr. Sahai's decision could not be overruled. It was Dr. Sahai that recommended Ms. Davies not be hired because of her pregnancy. As far as he was concerned, she was qualified.

Q. Did you ask Mr. Hakes what role he played in the decision concerning Ms. Davies versus the role of Dr. Sahai in the decision? A. Mr. Hakes hires for the production line. He interviews persons sent from Job Service. Initially he would determine if they are qualified, then he sends the person to get a physical, but Dr. Sahai determines whether or not they will be hired based on the physical, and Mr. Hakes said he could not overrule the doctor's decision.

Q. Did Mr. Hakes indicate whether he followed the doctor's recommendation in Ms. Davies' case? A. Yes, he did.

The majority notes "[i]t is perhaps unfortunate that the form of Dr. Sahai's written opinion was a conclusory recommendation as to whether Davies should be hired." The majority, of course, is again resorting to a de novo review and insisting that Sahai in truth did not recommend against hiring Davies but was only giving advice. The testimony elicited from the commission investigator substantiates the commission's finding that Sahai did in fact recommend and *determine* whether an applicant should be hired. Nissen blindly accepted Sahai's recommendation, and it made no difference to the company what motivated that recommendation.

The primary reason, however, for the majority's rejection of the "control over employment opportunities" cases appears to be that these cases did not involve "the exercise of independent professional judgment." By relying on this distinction, the majority has created an exception to our civil rights law for professionals giving opinions within their area of expertise. The majority justifies its position by noting "an employer should be free to seek out expert medical opinion." While this may be true, it is no justification

for concluding the expert is free to discriminate simply because he or she does so under the guise of "professional judgment." The immunity created by the majority has no support in the broad language of section 216.6(1)(a) or the purposes underlying discrimination laws.

III. Sahai suggests that if a physician can be held liable under the circumstances of this case, the physician will be placed in a dilemma. The dilemma, he claims, is having to choose between (1) violating a physician's Hippocratic oath not to knowingly harm a patient or (2) facing discrimination allegations. By the tone of its opinion, the majority implicitly agrees.

I see no such dilemma. Nissen employed Sahai to give a medical opinion on Davies' fitness to work. Davies was clearly able to perform assembly-line work when Sahai examined her, and Sahai should have approved her for this work. Such an opinion would not have prevented Sahai from honoring his Hippocratic oath. All Sahai had to do to comply with both his oath and the law was to (1) warn Davies of the increased risks associated with a pregnant woman doing assembly-line work, (2) advise her against taking the job because of these risks, and (3) leave the final decision to her. Instead, he made the decision for her.

In essence, Sahai was like a gatekeeper to job opportunities at Nissen. A successful physical and favorable recommendation constituted the entry way to those opportunities. In Davies' case, passage was conditioned on a discriminatory criterion, nonpregnancy.

In my opinion, Sahai's decision not to classify Davies as fit for employment solely because she was pregnant violated the Iowa Civil Rights Act. The commission correctly decided this case, and I would affirm.

NEUMAN, ANDREASEN, and TERNUS, JJ., join this dissent.