APPEL, Justice (dissenting).
I respectfully dissent.
A flat-out ban from employment on anyone with a recurrence of multiple sclerosis (MS) within the last three years is precisely the kind of stereotyping that the disability-discrimination provisions of the Iowa Civil Rights Act (ICRA) are designed to prevent. How is it that such stereotyping was applied to Nolan Deeds? The evasion of the ICRA was achieved when the employer contracted out the physical examination to a third party.
Can it be that an employer can avoid responsibility for disability discrimination by contracting out the physical examination to a third party and simply following the third party's conclusory recommendation that the person is not qualified for the *352 job because of a medical condition? I do not think so.
I begin with an overview of disability stereotyping under the ICRA. The ICRA directs us to construe it "broadly to effectuate its purposes." Iowa Code § 216.18 (2014). In construing the prohibition on disability discrimination, we have endorsed the proposition that the prohibition on disability discrimination covers not just "affirmative animus" but also "discrimination based on thoughtlessness, apathy, or stereotype." Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n , 850 N.W.2d 326, 333 (Iowa 2014) (applying framework for discrimination claims under the Federal Americans with Disabilities Act and Rehabilitation Act to claim made under ICRA); see Alexander v. Choate , 469 U.S. 287, 295-97, 105 S.Ct. 712, 717-18, 83 L.Ed.2d 661 (1985). Legislation prohibiting disability discrimination "assures that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." Probasco v. Iowa Civil Rights Comm'n , 420 N.W.2d 432, 436 (Iowa 1988) (quoting Forrisi v. Bowen , 794 F.2d 931, 934 (4th Cir. 1986) ). It does not matter if an employer acted in good faith in taking discriminatory actions when the discrimination is based on unfounded stereotyping. "Stereotyping is no less harmful to the handicapped employee when it is based on good faith." Me. Human Rights Comm'n v. Canadian Pac. Ltd. , 458 A.2d 1225, 1231 (Me. 1983).
How does the basic antistereotype principle of the ICRA apply in this case? Due to the physically demanding nature of being a firefighter, fire departments may properly screen employees to ensure that they meet the health requirements for the job. See Iowa Code § 400.8(1) (requiring physical examination of firefighter applicant to determine "physical or mental agility of the applicant" but prohibiting consideration of applicant's "height, weight, sex, or race"); Stephanie C. Griffin et al., Evaluation of a Fitness Intervention for New Firefighters: Injury Reduction and Economic Benefits , 22 Inj. Prevention 181, 181 (2016) ("Firefighting is a hazardous profession that often requires strenuous work in dynamic and unpredictable environments."). Under Iowa Code section 400.8(1), the Municipal Fire and Police Retirement System of Iowa sets the standards for the entrance examination. These standards do not mention MS. See Medical Examination Protocol for Firefighters , MFPRSI, [hereinafter MFPRSI, Medical Examination Protocol ], www.mfprsi.org/site_mcdra/pdfs/fire_protocal_2.pdf (last visited June 18, 2018) [https://perma.cc//KD9E-RZ4W].
The National Fire Protection Association (NFPA) Standard states that anyone with MS who has experienced a recurrence or a progression of the disease within three years prior to the examination is precluded from serving as a firefighter. Nat'l Fire Prof. Ass'n, NFPA 1582 Standard on Comprehensive Occupational Medical Program for Fire Departments §§ 3.3.13.1, 6.17.1(4) (2013 ed.). The statutorily mandated Iowa standards, however, do not refer to the national standard nor direct healthcare providers to use the NFPA standard. MFPRSI, Medical Examination Protocol .
But a flat-out ban on anyone with a recurrence of MS within the last three years is exactly the sort of stereotyping about an illness that the ICRA was enacted to prohibit. See Probasco , 420 N.W.2d at 436. Such a ban is far from the sort of individualized medical determination that is required under the ICRA to be a legitimate medical reason for denying employment as a firefighter due to MS. See *353 Frank v. Am. Freight Sys., Inc. , 398 N.W.2d 797, 801 (Iowa 1987) ; see also Holiday v. City of Chattanooga , 206 F.3d 637, 643 (6th Cir. 2000) (holding under the ADA, the district court erroneously treated as dispositive a medical opinion that concluded the potential employee could not perform the job when there was no evidence the doctor conducted an individualized inquiry into whether the potential employee's disability would actually interfere with job performance); Me. Human Rights Comm'n , 458 A.2d at 1232-34 (rejecting, under the Maine Human Rights Act, medical examinations flatly disqualifying all candidates with certain medical conditions without statistical evidence that every person with that condition is unable to successfully perform the job, and requiring individual assessments).
So if the use of a flat-out ban is prohibited by the ICRA, does the fact that the stereotype was applied by a physician, whom the employer contracted with to perform medical evaluations of prospective employees, change anything? Under the Iowa law of agency, "[t]he party asserting an agency relationship must prove its existence by a preponderance of the evidence." Soults Farms, Inc. v. Schafer , 797 N.W.2d 92, 100 (Iowa 2011) ; see Chariton Feed & Grain, Inc. v. Harder , 369 N.W.2d 777, 789 (Iowa 1985) (en banc). An agency relationship is created by (1) a manifestation of consent by the principal that the agent shall act on the principal's behalf and subject to the principal's control, and (2) "consent by the [agent] to so act." Soults Farms , 797 N.W.2d at 100 (quoting Pillsbury Co. v. Ward , 250 N.W.2d 35, 38 (Iowa 1977) ). "An agency relationship can be established through the agent's actual or apparent authority to act on behalf of the principal." Id. ; accord Fed. Land Bank of Omaha v. Union Bank & Tr. Co. of Ottumwa , 228 Iowa 205, 209-10, 290 N.W. 512, 514-15, supplemented on other grounds on denial of reh'g, 292 N.W. 852, 853 (Iowa 1940).
Although the issues before the court in Sahai v. Davies , 557 N.W.2d 898 (Iowa 1997) (en banc), were somewhat different, the case is still instructive. In Sahai , a prospective employee sued the prospective employer as well as the physician and medical clinic (medical defendants) that performed the preemployment physical on behalf of the prospective employer. Id. at 899, 900 (plurality opinion).[11] The Iowa Civil Rights Commission found that the medical defendants engaged in sexual discrimination, but the Sahai court reversed. Id. at 899. The Sahai plurality found the medical defendants did not commit sexual discrimination because there was no evidence that the physician's recommendation not to hire the plaintiff was solely based on a stereotyped judgment that all pregnant women were unable to perform the job. Id. at 901-02. We noted that while the physician's written opinion was simply a conclusory recommendation not to hire the plaintiff, the physician subsequently phoned the prospective employer and expressed his belief that women who were fourteen-weeks pregnant should not be hired to do assembly-line work when they had never done that type of work before. Id. at 902. We explained that, at that point, the prospective employer was "free to ask follow-up questions" to determine whether the physician's recommendation was based on stereotyped views of pregnant women or on the plaintiff's individual limitations, and since it did not it "might have violated employment discrimination laws." Id. But this did not make the physician's recommendation itself a sexually discriminatory *354 act. Id. While this observation is dicta, it strongly suggests that the plaintiff may have had a discrimination claim against her prospective employer. However, the issues involving the prospective employer were not the subject of the appeal. Id. at 900, 902.
As in Sahai, the City certainly was free to ask follow up questions. When Dr. Ann McKinstry performed a physical examination on Deeds, she learned from him that he had MS. After consulting with Dr. Jeffrey Westpheling and reviewing Deeds's medical records from his neurologist and the NFPA Standards, Dr. McKinstry completed the MFPRSI medical examination form and indicated Deeds was not qualified to do the essential functions of the job. She did not indicate on the form why he was not qualified, even though the form requested the physician to do so. The form was faxed to the Marion fire chief but he made no inquiry into the reason for the disqualification. As in Sahai , the City followed a "don't ask, don't tell" approach.
Other courts have held that when a doctor is conducting a mandatory health screening on behalf of an employer, the doctor may be an agent of the employer. See Garlitz v. Alpena Reg'l Med. Ctr. , 834 F.Supp.2d 668, 680-81 (E.D. Mich. 2011) ; Jimenez v. Dyncorp Int'l, LLC , 635 F.Supp.2d 592, 602-04 (W.D. Tex. 2009) ; cf. Tex. Emp'rs' Ins. Ass'n v. Vineyard , 296 S.W.2d 588, 590 (Tex. Civ. App. 1956) (holding the doctor conducting the workers' compensation examination was the employer's agent, such that the doctor's fraudulent statements to the employee in settlement negotiations were the responsibility of the employer).
In Jimenez , the employer required job applicants to undergo training and evaluations by independent contractors, which included a psychological evaluation conducted by a doctor employed by one of the independent contractors. 635 F.Supp.2d at 597. The plaintiff failed the psychological exam, and the employer rescinded its conditional offer of employment. Id. at 598-99. The plaintiff alleged the doctor failed her based on gender discrimination. Id. at 599.
The federal district court held the doctor was the agent of the employer under Title VII based on common law agency principles and the liberal interpretation given to Title VII provisions. Id. at 601-02. The court noted the plaintiff's failed psychological evaluation was the sole basis for the employer rescinding the employment offer and the employer provided no further review of the doctor's decisions before rescinding the offer. Id. at 602. Thus, the court explained, "it is clear that [the employer] delegated to [the doctor] and [the independent contractor] the power to 'hire, fire, and perform other employer functions' " or, at the very least, allowed the doctor to "participate[ ] in the decision-making process" of the employer. Id. (first quoting Cuesta v. Tex. Dep't of Criminal Justice , 805 F.Supp. 451, 455 (W.D. Tex. 1991) ; and then quoting Hamilton v. Rodgers , 791 F.2d 439, 443 (5th Cir. 1986), overruled on other grounds by Harvey v. Blake , 913 F.2d 226, 228 n.2 (5th Cir. 1990) ).
The court distinguished the case from Crocker v. Runyon , 207 F.3d 314 (6th Cir. 2000). Jimenez , 635 F.Supp.2d at 602-03. The Crocker court held the employer's reliance on outside medical opinions in making its hiring decision was not discriminatory, 207 F.3d at 319, but the Jimenez court noted, "the plaintiff in Crocker never argued that the doctors providing medical opinions were agents of the [employer]," 635 F.Supp.2d at 602. Consequently, unlike in Jimenez , the issue in Crocker was not whether the plaintiff failed to show the defendant took an adverse employment action because of the handicap, but rather *355 whether the plaintiff was able to show that he was otherwise qualified for the job with or without a reasonable accommodation. Compare Crocker , 207 F.3d at 318-19, with Jimenez , 635 F.Supp.2d at 603.[12]
In Garlitz , the federal district court held there was a genuine issue of material fact as to whether the preemployment-examination doctor was the defendant-employer's agent. 834 F.Supp.2d at 680. As a condition of the offer of employment, the defendant required the plaintiff to undergo a medical examination at an independent clinic that was contracted to perform preemployment examinations. Id. at 672. The plaintiff refused to answer the clinic's medical-history questions about pregnancy and birth control, and the clinic did not pass her because she withheld the information. Id. at 673. The defendant then rescinded its offer of employment. Id. at 673-74. The defendant argued that it was not responsible for the questions asked by the clinic-the clinic was an independent organization and the defendant did not direct it to ask the questions-and, thus, it was entitled to summary judgment on the discrimination claim. Id. at 679, 680.
In determining whether the clinic was the defendant's agent, the Garlitz court looked at the common law of agency and the Restatement (Second) of Agency. Id. at 681. The court noted that the Restatement (Second) defines the agency relationship as "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Id. (quoting Restatement (Second) of Agency § 1, at 7 (1958) [hereinafter Restatement (Second) of Agency] ). Here, the court explained, the defendant "delegated to [the clinic] the authority to make certain aspects of [the defendant's] employment decisions." Id. The plaintiff needed to pass the clinic's health examination to receive the job, and she could not pass unless she answered all of the questions asked by the clinic. Id. Further, the defendant and the clinic's relationship was exclusive-the defendant sent all of its potential employees to the clinic for preemployment physicals unless the clinic lacked the capacity to conduct the physicals. Id. at 681-82. The court concluded the defendant, "[i]n practical terms, ... delegated some hiring decisions to [the clinic]." Id. at 682.
On the issue of the amount of control the defendant exercised over the clinic's screening practices, there was a genuine issue of material fact as to whether the defendant ever communicated to the clinic the reason why it was sending individuals to the clinic. Id. at 682-83. The court acknowledged,
[I]t is possible that [the defendant] never communicated the reason it was paying [the clinic] to conduct these physicals, the reason it wanted these individuals to receive physicals, the *356 type of information [the defendant] wished to obtain from the physicals, or [the defendant's] purpose in entering into the exclusive, ongoing arrangement with [the clinic] to have [the clinic] provide physicals.
Id. at 683. Yet there was some testimony from the defendant "that [it] and [the clinic] had worked together to develop the content of the physical exams" the clinic used to determine whether the employee was qualified to perform the essential functions of the job. Id. While this testimony created a genuine issue of material fact, ultimately, "the actual exercise of control is not essential to create an agency relationship." Id. The dispositive finding is "the right to control the conduct of the agent," not whether the principal ever exercised that control. Id. (emphasis added) (quoting Restatement (Second) of Agency § 14, at 60). The court thus denied this part of the defendant's motion for summary judgment. Id. at 690.
Here, Deeds has created a genuine issue of material fact as to whether the UnityPoint defendants were the City's agents. A reasonable fact finder could conclude that the City had control over how the UnityPoint defendants conducted their exams for the City's firefighters based on the testimony of Dr. McKinstry. Like in Garlitz , there is some evidence the City communicated to the UnityPoint defendants its requirements about physicals and what it wished to obtain from the physicals. See id. at 681, 682-83. A medical provider that is truly not an agent of the employer would only incidentally conduct physicals on the employer's behalf, e.g., without a contractual relationship. Cf. id. at 682 (noting defendant-principal-contracted with third party-agent-to perform the examinations); Jimenez , 635 F.Supp.2d at 597 (same). A reasonable jury could find the City's control over the UnityPoint defendants demonstrated a principal-agent relationship.
Further, like in Garlitz and Jimenez , a fact finder could determine the City, in effect, delegated its employment decisions to the UnityPoint defendants. See Garlitz , 834 F.Supp.2d at 682 ; Jimenez , 635 F.Supp.2d at 602. Deeds had to pass the physical in order to be employed by the City. The fact that Deeds did not pass the physical was the only reason why the City rescinded its conditional offer of employment.
The majority focuses on the facts that the UnityPoint defendants are independent contractors and that the City did not control how Dr. McKinstry conducted the examination. However, just because the UnityPoint defendants are independent contractors, does not mean that they are not the City's agents. And, as I explained above, there is some evidence in the record suggesting the City did , in some sense, control how Dr. McKinstry conducted the examination by directing the UnityPoint defendants to perform certain medical tests for the purpose of ensuring that potential employees were able to serve as firefighters. The mere fact that Dr. McKinstry may have exercised some medical judgment in conducting the tests does not change this crucial element of control.
Here, unlike in Sahai , we are considering whether an employer discriminated against an employee when the employer did not ask the UnityPoint doctor for the basis of the medical disqualification. See 557 N.W.2d at 901 (noting the gender discrimination issues involving the employer were not the subjects of the appeal; only the discrimination issues involving the doctor and the clinic were). Sahai suggests that such an employer commits discrimination when it fails to do so. Id. at 902.
To hold otherwise would be to encourage employers to take a "don't ask, don't tell"
*357 approach. This would permit employers to evade the ICRA. Cf. Bates v. Dura Auto. Sys., Inc. , 767 F.3d 566, 577 (6th Cir. 2014) ("[A]n employer cannot hire a third party to discriminate on its behalf."); Wilks v. Taylor Sch. Dist. , 174 Mich.App. 232, 435 N.W.2d 436, 437-38 (1988) (per curiam) (noting defendants are not shielded from liability due to relying on doctor's opinion because to hold otherwise could allow the employer "and its hired physician [to] collude, connive or conspire to eliminate a handicapped applicant's chances for employment ... by making certain that the applicant never be issued the medical certification required under the law"); Mary Crossley, Infected Judgment: Legal Responses to Physician Bias , 48 Vill. L. Rev. 195, 279 (2003) (cautioning that biased medical decisions could be beyond the reach of antidiscrimination laws if the employer is able to escape liability for a physician's medical disqualification); Daniel L. Stickler & Albert F. Sebok, Legal Issues Surrounding Preemployment Physical Examinations in the Coal Industry , 94 W. Va. L. Rev. 811, 827 & n.84 (1992) ("Courts, however, will not find an employer immune from claims of handicap discrimination merely because the employer has relied upon a physician's opinion.").
I now turn to the question of whether Deeds may be considered responsible for the employer's actions because of his failure to engage in the interactive process. I would not uphold the district court's ruling on the basis of Deeds's failure to cooperate with the interactive process. The City offered Deeds retesting only after it denied him employment due to his MS. A potential employee must comply with the interactive process only when the employer seeks to offer the potential employee a reasonable accommodation for the disability, not after the employer has already denied employment. See Fahey v. Twin City Fan Cos. , 994 F.Supp.2d 1064, 1079 (D.S.D. 2014) (emphasizing that an employer has a duty to engage in an interactive process in good faith before rescinding an offer of employment based on a disability when it is aware of the general disability but not the employee's individual limitations); see also Taylor v. Phoenixville Sch. Dist. , 184 F.3d 296, 313-14 (3d Cir. 1999) (explaining that an employer's knowledge of an employee's disability and the employee's desire to work in spite of the disability triggers the employer's duty to initiate the interactive process before taking negative employment action and that no magic words requesting a "reasonable accommodation" are needed).
Next, there is a question of whether the district court properly dismissed Deeds's claim against the UnityPoint defendants. I would reverse the district court's grant of summary judgment to the UnityPoint defendants. Iowa Code section 216.11(1) states that intentionally aiding and abetting "another person" engaging in any unfair or discriminatory practice under the ICRA is itself an unfair or discriminatory practice prohibited by the Act.
Here, unlike in Sahai , there is substantial evidence in the record that Dr. McKinstry did not exercise her independent medical judgment in determining that Deeds was not medically qualified for the position. See 557 N.W.2d at 901. Dr. McKinstry testified that once she learned Deeds had MS and the NFPA Standard banned anyone with MS from serving as a firefighter, any further exploration of Deeds's actual ability to perform the essential functions of the job with or without reasonable accommodations was "a moot point." This stereotyped thinking without considering whether the individual employee can perform the essential functions of the job is the kind of discrimination that the ICRA is designed to prevent. See Probasco , 420 N.W.2d at 436. Further, unlike in Sahai , *358 there is evidence that the City simply adopted the conclusory disqualification and that the UnityPoint defendants did not act in an advisory role. See 557 N.W.2d at 901. I conclude there was adequate evidence to show the UnityPoint defendants aided and abetted the discriminatory action of the City.
For the above reasons, I would vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for further proceedings.
Wiggins, J., joins this dissent.

In Sahai , four justices joined the plurality, Justice Harris concurred in the result, and four justices dissented. 557 N.W.2d at 899, 903.

In Crocker , the defendant's physicians did conduct individualized preemployment physicals on the plaintiff, and the plaintiff was only able to present more favorable medical opinions based on examinations conducted years after the defendant decided not to hire the plaintiff. 207 F.3d at 317-18. Such examinations conducted years later, the United States Court of Appeals for the Sixth Circuit explained, did not show that the plaintiff was qualified at the time of the hiring decision. Id. at 318. The court contrasted the physicians' individualized examinations of the plaintiff to determine the plaintiff's job capabilities with Holiday , 206 F.3d at 643-44, where there was evidence of the plaintiff's contemporaneous ability to serve as a police officer and the physician did not consider the plaintiff's personal HIV symptoms and prognosis but based his medical opinion on the stereotyped view that individuals with HIV could not serve as police officers. Crocker , 207 F.3d at 320. In Crocker , the employer relied on the individualized, nonstereotyped opinions in good faith. Id.