# IN THE SUPREME COURT OF IOWA

No. 20–0135

Submitted February 17, 2021—Filed June 25, 2021

**RONALD RUMSEY,**

Appellee,

vs.

**WOODGRAIN MILLWORK, INC.** d/b/a
**WINDSOR WINDOWS AND DOORS,**
**LIZ MALLANEY,** and **CLAY COPPOCK,**

Appellants.

Appeal from the Iowa District Court for Polk County, Coleman McAllister, Judge.

Defendants, as employer, appeal denial of their motion for directed verdict following jury trial on employee's disability-discrimination-related claims. **REVERSED AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Randall D. Armentrout (argued) and Leslie C. Behaunek of Nyemaster Goode, P.C., Des Moines, for appellants.

David Albrecht (argued) and Madison Fiedler Carlson of Fiedler Law Firm, P.L.C., Johnston, for appellee.

**OXLEY, Justice.**

This case involves the not uncommon, yet often murky, intersection between worker's compensation and disability discrimination. In this case, an injured employee with a preexisting hearing impairment continued to work while rehabilitating from a workplace injury. The employer assisted the rehabilitation by providing light-duty work consistent with the temporary workplace restrictions imposed by the employee's doctors. A disagreement arose concerning whether the employee was entitled to a specific work restriction, and the employee was fired. In the ensuing disability discrimination litigation, the employer claimed the firing was based on insubordination. The employee claimed the employer discriminated against him by firing him when he sought a reasonable accommodation for a disability. A jury accepted the employee's claim and awarded damages.

As is often the case with workplace injuries, the employer complied with physician-imposed restrictions for the work injury by providing temporary light-duty work, but that work was not otherwise available as a full-time job. Yet for disability discrimination purposes, the employee must prove he could perform the essential functions of the job. And courts, including ours, routinely hold that an employer need not create a new job as an accommodation for disability discrimination purposes. We preserve that limitation. To hold otherwise would broaden the obligations an employer owes to accommodate disabilities when an employee is injured on the job, blurring the distinct obligations an employer owes to its injured workers for purposes of worker's compensation and those it owes to its disabled employees for purposes of disability discrimination. Not every workplace injury results in a disability that can be accommodated. To the extent the plaintiff's disability claims were based

on the workplace injury, the plaintiff's failure to identify any job he could perform apart from the temporary light-duty work defeats his claims.

The hearing-impaired plaintiff also brought disability claims stemming from his request for a sign language interpreter. His failure-to-accommodate and retaliation claims related to that request did not depend on the worker's compensation imposed restrictions or the plaintiff's ability to prove his ability to perform a specific job. Although the jury found for the plaintiff on those claims, the jury instructions and verdict form prevent us from determining whether those verdicts were based on the work injury or the request for a sign language interpreter. The defendants are therefore entitled to a new trial on those two distinct claims.

## I. Factual Background and Proceedings.

Ronald Rumsey has been deaf since birth. He uses a hearing aid, which allows him to hear loud noises, but he relies primarily on lip reading and sign language to communicate. In 2007, Rumsey began working for Woodgrain Millwork (Windsor). Rumsey was an exemplary employee for many years, earning favorable performance reviews and "employee of the month twice," once in 2010 and once in 2012. Although he did not use them in his day-to-day work, Rumsey requested a sign language interpreter for certain events, such as speaking with human resources or attending doctor's appointments for his work-related injuries, and Windsor provided them.

In early 2015, Rumsey was working the "IG Wrap" job, where he wrapped large panes of glass for shipping. Windsor classified this job as a "Material Handler II" position. On January 21, Rumsey hurt his back and shoulder while moving a large pane of glass from the rack to the worktable for wrapping. As he twisted to position the glass, he felt a sharp pain in his shoulder and a pop in his back, causing him to drop the glass

and fall to the floor. He filed a worker's compensation claim with Windsor's worker's compensation carrier and received medical treatment from company-provided doctors. Over the ensuing months, Rumsey's doctors gave him various work restrictions, and Windsor complied with the restrictions by assigning him to light-duty work.

Rumsey initially saw Dr. Daniel Miller, an occupational-medicine physician, who referred Rumsey to Dr. Todd Harbach for his shoulder and back pain on February 9. Dr. Harbach determined Rumsey's back pain was nonoperable but diagnosed impingement syndrome in his right shoulder that would benefit from surgery. Dr. Harbach scheduled Rumsey for shoulder surgery in September and returned him to the care of other doctors for continued occupational therapy and pain management for his back. Rumsey used sign language interpreters for all of his doctor's appointments.

On July 29, Dr. Miller concluded Rumsey's back had reached maximum medical improvement (MMI). Dr. Miller issued a permanent ten-pound lifting restriction at that time, and it became clear Rumsey could not return to his previous position due to the heavy-lifting requirements that were part of that job. Even though he reached MMI for his back in July, Rumsey continued to experience back pain and took substantial time off, using his sick leave and vacation days to cover the time. When he did come to work, he performed light-duty work such as inspecting the quality of glass.

Meanwhile, Dr. Harbach performed a right-shoulder arthroscopic acromioplasty and distal clavicle excision on September 23 and ordered physical therapy for Rumsey's shoulder recovery. Rumsey returned to work in November, but he continued to experience back and shoulder pain.

Windsor's Human Resources (HR) director Liz Mallaney worked with Rumsey to implement the work restrictions imposed by his doctors. Rumsey presented evidence that Mallaney was not always patient with his requests. For instance, when Rumsey went home early one day because of back pain, Mallaney responded to the email explaining Rumsey's early departure with the single word "Dying." Rumsey testified Mallaney told him she could only implement the restrictions he believed he needed if she had a doctor's authorization but then she failed to set up doctor's appointments.

Rumsey saw Dr. Harbach on December 10 as a follow-up for his shoulder surgery. At that appointment, Rumsey reported improvement in his shoulder with continuing pain, and Dr. Harbach renewed his order for physical therapy with hopes of reaching MMI for his shoulder in four to six weeks. Rumsey also reported continuing back pain and asked whether Dr. Harbach could add a sit-down restriction to his treatment plan. Noting he had previously treated Rumsey for his back, Dr. Harbach modified Rumsey's work restrictions to add a temporary sit-down restriction.

Rumsey gave the new work restrictions, including the sit-down restriction, to Mallaney on Friday, December 11, and went home for the day. Mallaney promptly emailed Windsor's worker's compensation coordinator, saying, "Action MUST be taken on Ron Rumsey." In the email, Mallaney emphasized that the restrictions were for Rumsey's shoulder, questioning "[w]hy sit down work for a shoulder?" She also questioned Rumsey's claim that "Dr. Harbach informed him Windsor needs to deal with the back" when the back injury was closed.

The worker's compensation coordinator contacted Dr. Harbach's office and requested that Dr. Harbach submit an addendum to the document recanting the sit-down restriction because Dr. Miller, not

Dr. Harbach, was treating Rumsey's back. Dr. Harbach issued an addendum Saturday morning, noting:

> I had previously returned the patient to Dr. Miller, an[] occupational medicine physician, for continued care of his low back. Therefore, I cannot provide restrictions related to [Rumsey's] lumbar spine at this time. I retracted those restrictions and return[ed] [Rumsey] to Dr. Miller for those restrictions.

At his deposition, Dr. Harbach testified his medical opinion remained that the restriction would have helped Rumsey's pain but that he had overstepped his role so he followed the instructions of his worker's compensation liaison and issued the addendum.

What happened next is largely contested by the parties. Construing the evidence in the light most favorable to Rumsey, the jury could have found the following. Rumsey returned to work on Tuesday. When asked to sign his work restrictions, Rumsey was surprised and confused not to see the sit-down restriction and refused to sign the modified document. A floor supervisor then asked Clay Coppock, the production manager, to discuss the restrictions with Rumsey. Coppock insisted Rumsey sign the document. Rumsey admittedly became upset and angry, so Rumsey and Coppock went to speak to Mallaney about it. On the way to Mallaney's office, Coppock repeatedly told Rumsey to sign the document.

In Mallaney's office, Coppock and Mallaney spoke in a location where Rumsey could not read their lips before they returned to speak with him. Coppock and Mallaney told Rumsey they would need to discuss the situation with Peter Crivaro, the head of HR, but that Crivaro would not arrive until 8:00 a.m., over an hour wait. Rumsey said he was going to request an interpreter for the meeting with Crivaro and, since he did not think they could locate an interpreter on such short notice, he was going home. Rumsey further testified that he tried to text his worker's

compensation attorney while in Mallaney's office and Mallaney and Coppock stopped him. He sent a text shortly after he left requesting thirty minutes' notice for him to return if Mallaney could find an interpreter for the meeting with Crivaro.

Mallaney and Coppock presented a different story, testifying that Rumsey got in Coppock's face, yelled at both of them using profanity, knocked the doctor's papers out of Mallaney's hand, and behaved in a threatening manner that left Mallaney in fear of him.

After Rumsey left, Mallaney and Coppock decided Rumsey should be fired for insubordination and made that recommendation to Crivaro when he arrived at work. Crivaro terminated Rumsey's employment without meeting with him to discuss the restrictions. Because Rumsey was represented by counsel, Crivaro contacted Windsor's attorney to relay the termination decision to Rumsey's attorney, who then contacted Rumsey to inform him he had been fired.

At the time of his firing, Windsor's employment records identified Rumsey as a "Fabricator." Rumsey testified that, at that time, he worked at a job "beading" doors, where he applied weather stripping to wooden doors followed by foam that would later be removed to join glass to the wood, one of many tasks involved in the Fabricator position. Rumsey never actually worked full time on the beading work, though Rumsey testified the job could be done full time. Coppock testified, uncontested, that if someone did the beading job full time, the person would have to bead more doors than Windsor produced. Additionally, Mallaney testified that although Rumsey was doing the beading work "full time," that work was a light-duty accommodation. Moreover, Rumsey did not work full-time hours in the weeks before he was fired.

The parties introduced job descriptions for both the Material Handler II and the Fabricator positions as exhibits at trial. The Material Handler description declared the position required "[f]requent lifting, carrying, pushing and pulling" of objects over fifty pounds, while the Fabricator position required only occasional lifting, carrying, pushing, and pulling. Rumsey presented no evidence that he was able to perform any parts of the Fabricator job other than the beading work.

Rumsey also alleged he was mistreated because of his hearing impairment throughout his time working at Windsor. The only allegation related to his hearing impairment that occurred within the statutory time frame for bringing a civil rights claim was Rumsey's request for an interpreter for the December 15 meeting that never happened. Although other incidents were outside the statute-of-limitations period for the disability claim, the district court allowed some evidence of Windsor's conduct related to his hearing impairment for the limited purpose of proving discriminatory motive but excluded other evidence.

Rumsey took the firing hard. He had a history of difficulties with other jobs in the past related to his hearing impairment, and he thought he finally found a place he could work until he retired. Rumsey choked up on the stand testifying about the pride he took in the work he did at Windsor. The loss of Rumsey's job was also a serious financial blow to his family because his wife was sick and could not work full time.

Rumsey sued Windsor for disability discrimination under the Iowa Civil Rights Act (ICRA). He brought three specific claims: disability discrimination, failure to accommodate, and retaliation for requesting an accommodation. In addition to bringing these claims against Windsor as his employer, Rumsey also named Mallaney and Coppock individually as defendants. In early 2017, Rumsey settled his worker's compensation

claims for $100,000 plus payment of Rumsey's medical bills related to his workplace injuries.

The case proceeded to jury trial on each of the three disability discrimination claims. The jury returned a verdict in favor of Rumsey, concluding the defendants were collectively liable under all three claims. The jury awarded $58,000 in back pay, $300,000 in past-emotional-distress damages, and $150,000 in future-emotional-distress damages. The court declined to award frontpay.

The defendants appeal. They argue the district court erred in not granting their motion for a directed verdict, particularly because Rumsey did not prove he was qualified to perform any permanent job at Windsor. Alternatively, they argue the instructions and verdict form should have explained individual liability for Coppock and Mallaney and provided separate lines for each defendant on the verdict form. They further argue neither Coppock nor Mallaney can be liable for discrimination under the ICRA because they are not supervisors. The defendants also challenge some of the district court's evidentiary rulings.

Rumsey cross-appeals the denial of frontpay and, if we remand for a new trial, the exclusion of testimony involving Rumsey's treatment by his coworkers. We retained the appeal.

As explained below, we conclude that the defendants were entitled to a directed verdict on each of Rumsey's claims except the failure-to-accommodate and retaliation claims related to requesting a sign language interpreter. Given the way the claims were intertwined at trial, the defendants are entitled to a new trial on those claims. We address the other issues raised by the parties only to the extent they may arise again on retrial.

## II. Standard of Review.

"We review the district court's rulings on motions for directed verdict for correction of errors at law." *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 768 (Iowa 2006). "[W]e view the evidence in the light most favorable to the nonmoving party to determine whether the evidence generated a fact question" that warranted submitting the issues to a jury. *Id.* "A directed verdict is required 'only if there was no substantial evidence to support the elements of the plaintiff's claim.' " *Pavone v. Kirke*, 801 N.W.2d 477, 487 (Iowa 2011) (quoting *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009)). "To overcome a motion for directed verdict, substantial evidence must exist to support each element of the claim or defense. Substantial evidence exists if reasonable minds could accept the evidence to reach the same findings." *Yates*, 721 N.W.2d at 768 (citation omitted).

## III. Analysis.

The defendants appeal the district court's denial of their motion for directed verdict. Specifically, the defendants argue that Rumsey failed to prove he was qualified to perform the essential functions of his job, a necessary element of his disability discrimination and failure-to-accommodate claims. A fighting issue in this appeal is identifying what "job" the jury was required to consider in determining whether Rumsey could perform its essential functions.

The defendants argue that, as an element of Rumsey's case in chief, Rumsey was required to identify a specific job and the job had to be a permanent job available at Windsor. In an effort to provide "suitable work" within the context of Rumsey's worker's compensation claim, Windsor arranged for Rumsey to perform light-duty work while Rumsey was

rehabilitating the injuries to his back and shoulder.[1] However, the defendants argue disability discrimination laws do not require employers to create a permanent light-duty job where none currently existed. Rumsey responds by identifying the "beading" job, part of the fabricator category of positions, as a job he could perform. He also argues he is not required to identify a specific job because Windsor admitted it was willing to accommodate him with light-duty work and did not terminate him for lack of an available job.

The instructions to the jury did not require it to identify what job Rumsey could perform or otherwise limit the types of jobs the jury could consider in determining whether Rumsey was able to perform the essential functions of his job. The relevant element of the jury instructions for Rumsey's disability discrimination and failure-to-accommodate claims had similar requirements.

Instruction No. 17 for the disability discrimination claim required Rumsey to prove as element four:

> At the time of his termination, Plaintiff could have performed the "essential functions" of his job, with or without "reasonable accommodations."

Instruction No. 19 for the failure-to-accommodate claim required Rumsey to prove as element four:

> The Plaintiff could have performed the essential functions of his job at the time of his termination if the Plaintiff had been provided with sit down work and/or a sign language interpreter.

---

[1]*See Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012) ("Iowa Code section 85.33(3) disqualifies an employee from receiving temporary partial, temporary total, and healing period benefits if the employer offers 'suitable work' that the employee refuses. If the employer fails to offer suitable work, the employee will not be disqualified from receiving benefits regardless of the employee's motive for refusing the unsuitable work." (citations omitted)).

"Job" was not otherwise defined in the jury instructions. Nor was the jury instructed to determine what "job" Rumsey could perform.

In determining whether the district court should have granted a directed verdict, we judge the evidence against the jury instructions when the parties do not object to the instructions. *See Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008) (explaining instructions become the law of the case when the parties make no objections). But here, the defendants challenged each of the instructions by seeking to add language describing the job as "a full-time, non-light duty job." The defendants argued that

> [b]ecause the provision of light duty work is not a reasonable accommodation as a matter of law, this instruction needs to make it clear to the jury that when they consider what Plaintiff's "job" was for purposes of his disability discrimination claim, they do not consider light duty tasks.

The district court rejected the requested language.

Given these objections, the jury instructions do not limit our analysis. *Cf. Shams v. Hassan*, 905 N.W.2d 158, 169 (Iowa 2017) (reversing jury verdict and remanding for new trial after district court failed to provide instruction on statute of limitations, recognizing district court's obligation to correctly instruct the jury on legal issues raised by parties even if requested instruction misstated the applicable legal principle). Rather, we apply the statute and applicable caselaw in determining whether the district court erred in denying the defendants' motion for directed verdict.

**A. The Plaintiff's Prima Facie Case for Disability Discrimination and Failure-to-Accommodate Claims.** Under the ICRA, an employer engages in "an unfair or discriminatory practice" if it discharges an employee "because of the . . . disability of such . . . employee." Iowa Code § 216.6(1)(*a*) (2017). The ICRA "only pronounces a

general proscription against discrimination and we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003).

> To prevail on a disability discrimination claim under the ICRA, [Rumsey] must initially prove a prima facie case by showing: (1) he has a disability, (2) he is qualified to perform the essential functions of [the job], and (3) the circumstances of his termination raise an inference of illegal discrimination.

*Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014).

For his separate claim for failure to provide a reasonable accommodation, Rumsey must prove he was a qualified individual, his employer knew of his disability, he requested a reasonable accommodation, and he suffered an adverse employment action. *See Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019) (describing elements of failure-to-accommodate claim under the Americans with Disabilities Act (ADA)); *Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019) (defining elements for failure to accommodate under both ADA and ICRA). The "qualified individual" element requires proving he could "perform the essential functions of [the] position, with or without reasonable accommodation.' " *Gardea*, 915 F.3d at 541 (second quoting *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013)).

The element at issue here is whether Rumsey was qualified to perform the essential functions of the job.[2]

**B. Does the "Bead Taping" Job Satisfy Rumsey's Burden of Proving He Was a Qualified Individual?** "The first step of our inquiry" into the qualified individual element is whether Rumsey "could perform

---

[2]Windsor does not dispute that Rumsey's hearing impairment as well as his back and shoulder injuries satisfy the first element that Rumsey was disabled for purposes of the ICRA.

the essential functions of the job." *Goodpaster*, 849 N.W.2d at 14 (second quoting *Boelman v. Manson State Bank*, 522 N.W.2d 73, 80 (Iowa 1994)). "[T]he court must consider whether the person has 'the requisite skill, experience, education and other job-related requirements of the employment position that such individual *holds or desires*.' " *Schlitzer v. Univ. of Iowa Hosps. & Clinics*, 641 N.W.2d 525, 531 (Iowa 2002) (quoting *Treanor v. MCI Telecomms. Corp.*, 200 F.3d 570, 575 (8th Cir. 2000)); *see also Goodpaster*, 849 N.W.2d at 14 (explaining whether an employee is "qualified" depends on "the needs of a particular job[] and the impact of disability on a person's ability to perform that job" (second quoting *Courtney v. Am. Nat'l Can Co.*, 537 N.W.2d 681, 685 (Iowa 1995))).

In July, Rumsey reached MMI for his back injury and his doctor imposed a permanent ten-pound lifting restriction. However, at the time of his termination in December, he was still attending physical therapy following his shoulder surgery, and that injury had not yet reached MMI.

The parties agree the heavy-lifting requirements of the IG Wrap job precluded Rumsey from returning to that position. That is not the end of the inquiry, however, because an employee can also show he is a qualified individual by identifying another position to which he could have been reassigned. *See Schlitzer*, 641 N.W.2d at 530–31 (considering whether hospital discriminated against nurse who sought reassignment); *see also* Iowa Admin. Code r. 161—8.28 ("When an individual becomes disabled, from whatever cause, during a term of employment, the employer shall make every reasonable effort to continue the individual in the same position or to retain and reassign the employee and to assist that individual's rehabilitation."). Thus, if an employee is unable to return to his former job, we look next to whether other jobs existed that he could

perform with or without accommodation. *See Schlitzer*, 641 N.W.2d at 530.

Rumsey "must identify a specific available job [he] is qualified to perform to ultimately recover under the [ICRA]." *Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521. "Without this showing, an employee cannot establish he or she is a qualified person." *Id.*; *see also Schlitzer*, 641 N.W.2d at 530 ("[The employee] has the burden of making a prima facie case that there was a job available and that she was qualified to fill it.").

Rumsey identifies the Fabricator position, which is the position identified in Windsor's personnel records at the time of his termination. He claims he performed "multiple jobs within his restrictions, including beading, maintenance, cleaning, floor scrubbing, glass quality inspection, putting screws in hinges, and organizing hardware." Rumsey identified the "beading" job throughout trial as the job he had been performing at the time of his termination and the one he was qualified to perform for purposes of his disability discrimination claims.

Reassignment requires the employee to identify a currently available vacant position the employee is qualified to perform. *See Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521; *see also Schlitzer*, 641 N.W.2d at 530. "[A]n accommodation by reassignment does not require an employer to respond by creating a vacant position." *Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521; *see also Schlitzer*, 641 N.W.2d at 530. Nor does it require the employer to create a new job from tasks taken from other employees, *see Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 730 (6th Cir. 2000) (affirming summary judgment for employer who refused deputy's requested reassignment to work full time in prison control booth where those duties were considered "easier" and rotated among all deputies as a relief position), or to turn a temporary light-duty position into a permanent

position, *see Malabarba v. Chi. Trib. Co.*, 149 F.3d 690, 697 (7th Cir. 1998) ("Although the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it does not require that employers convert temporary 'light-duty' jobs into permanent ones."); *see also Rehrs v. Iams Co.*, 486 F.3d 353, 359 (8th Cir. 2007) ("P & G [was not] required to create a new straight-shift technician position or similar position to accommodate Rehrs."); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999) ("Pizza Hut [is not] required to create a new position or to create a permanent position out of a temporary one as an accommodation."); *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996) ("The 'casing' position to which he was temporarily assigned was not an official position, but had been created by the Postal Service to give Shiring something to do on a temporary basis. Therefore, Shiring's suggestion that he would have been qualified to perform the requirements of such a position does not help his case because under the Act employers are not required to create positions specifically for the handicapped employee.").

With respect to not requiring employers to turn temporary workplace accommodations into permanent positions that did not previously exist, one court explained that if the law said otherwise, "[e]mployers would stop offering temporary light-duty assignments to accommodate temporary disabilities, fearing that their temporary elimination of certain essential functions of the job for those temporarily-disabled employees would force them to make their elimination permanent." *Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1114 (S.D. Ill. 2001). The accommodation Rumsey requested for his permanent back injury makes this point. Rumsey requested an accommodation for a sit-down position because standing hurt his back. The fourth element of Rumsey's failure-to-accommodate claim as instructed to the jury required Rumsey

to prove he "could have performed the essential functions of his job at the time of his termination if [he] had been provided with sit down work . . . ." The only position Rumsey identified that he could perform while sitting down was the bead-taping work.

The problem with Rumsey's argument is that bead taping was not a permanent job. It was a light-duty, temporary position created to give him suitable work while he was recuperating from his workplace injuries. It was not an actual full-time job. As Windsor described it, and Rumsey did not dispute, it is more accurately characterized as a task needed to be done as part of a number of duties involved in the Fabricator position. Windsor pulled that task out of other employees' job duties to provide light-duty work for Rumsey consistent with the restrictions imposed while he was rehabilitating from his injuries.

While Rumsey testified at trial that he worked at the bead-taping station "full time," that was after he explained "[b]eading was part of my light-duty restriction." Rumsey confirmed he never worked a full forty hours during any week at the bead-taping station, testifying only that he could have worked the position full time had he not needed to take time off for his back pain. It is undisputed that he only performed that work on a part-time basis over four weeks, during which he worked seven hours, sixteen hours, thirty-one hours, and six hours, respectively.

Rumsey's reliance on Mallaney's testimony does not support his assertion that bead-taping was a full-time position. While Rumsey's attorney may have characterized it as such in questioning Mallaney, her testimony made clear that it was a temporary light-duty position.[3]

---

[3]Mallaney's testimony was consistent between questioning by the plaintiff's counsel:

Coppock also testified that if someone worked at the bead-taping station as their only job, it would take fifteen minutes to bead the amount of sashes that could be produced in an hour, so that there was not enough work to keep a person busy if they only worked at the bead-taping station as a full-time position. Rumsey offered no evidence to contradict this explanation of the bead-taping work. Construing the evidence in the light most favorable to Rumsey, he failed to establish that the bead-taping position was anything other than a light-duty job provided to him on a temporary basis while he finished rehabilitating his workplace injuries.

---

Q. And Ron's job involved putting little strips of bead or foam along these thin light boards; right? A. Right. That was a small part of a job that an employee would do, yes, yes. It's called beading . . . .

Q. Beading. And this job that Ron was doing, putting the strips of bead, he performed full-time; right? A. With light-duty. Yes.

. . . .

Q. As you testified, that was full-time work; right? A. Light-duty work for him, yes.

. . . .

Q. Right. Now, Ron was certainly qualified to do the job as fabricator that he was performing; right? A. That one spot there, yes.

. . . .

Q. And had he not been fired, he could have continued on in that position; right? A. Like I said, that was a small part of another job.

Q. Ma'am, my -- I appreciate -- A. Yes.

. . . .

Q. Had Ron not been fired, he could have stayed in that full-time position; correct? A. With the light-duty restrictions, yes.

And by defense counsel:

Q. Does the bead taping line station, is it a full-time, full-duty position for anybody at Windsor? A. You mean by that is that the only job they do?

Q. Right. A. No. There's a variety of jobs that come with that. That doesn't take -- that's -- that's -- like I said, that's a little bit of a job that an employee does.

Q. So when Mr. Rumsey was doing this job, this was a small part of other people's jobs? A. Right.

Rumsey's argument that Windsor was required to engage in the interactive process before firing him does not save his claim. "Even if an employer fails to fully assist an employee in a request for reassignment, the employee must still show a specific position was available that he or she could have sought." *Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521; *see also Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 258 (6th Cir. 2000) ("Burns simply did not show that he was qualified to perform the positions that he now identifies in his brief as potential accommodations."); *Fjellestad*, 188 F.3d at 952 ("[A]n employer will not be held liable under the ADA for failing to engage in an interactive process if no reasonable accommodation was possible . . . ."); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc) ("Even if Midland Brake failed to fulfill its interactive obligations to help secure a reassignment position, Smith will not be entitled to recovery unless he can also show that a reasonable accommodation was possible and would have led to a reassignment position.").

Rumsey relies solely on the temporary light-duty work Windsor provided for him. But to bring a disability discrimination or failure-to-accommodate claim, he bears the burden of first proving he was a qualified individual, which includes identifying a permanent position he was qualified to perform, given the proper accommodations. The only accommodation he suggests is a sit-down position. His failure to present any evidence that Windsor had a permanent position that could be performed with that accommodation precludes his disability-discrimination-based claims. *See Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521; *see also Williams*, 190 F. Supp. 2d at 1117 ("While Eastside did accommodate Williams' temporary condition for two years, the duration of an arrangement to accommodate an employee's temporary condition is

not, by itself, sufficient to show that the arrangement was meant to last forever.").

We cannot ignore Rumsey's obligation, as part of his prima facie case, to identify a permanent position to which he could have been reassigned. As we explained in *Casey's General Stores, Inc. v. Blackford,*

> [a]lthough we interpret our statute to impose a duty on an employer to accommodate a worker who is unable to perform his or her job because of a disability, we still require an employee who seeks reassignment as an accommodation to show, as a predicate to recovery, that reassignment to a vacant position could have been accomplished. It is not enough for the employee to make a general claim of the existence of the vacant position.

661 N.W.2d at 523 (citation omitted). Here, Rumsey does not even claim such a position existed outside of the temporary light-duty work Windsor provided while he continued to rehabilitate his shoulder injury.

Requiring the employee to identify a specific vacant position for which he is qualified is consistent with the protections provided by the ICRA.

> Like the ADA, our unfair employment practices statute exists to eliminate discrimination against persons with disabilities, as well as discrimination based on other protected characteristics. We interpret the statute consistent with this purpose so that persons with disabilities will not suffer discrimination at the hands of employers in this state.

*Id.* at 525 (citation omitted). Nevertheless, as a predicate to recovery for a claim under the ICRA, we require a claimant to "show he or she was qualified to perform a specific vacant position sought." *Id.* Where the claimant "fail[s] to satisfy this burden," the claim fails as a matter of law. *Id.* at 517–19, 525 ("conclud[ing] as a matter of law that Blackford failed to establish he was a qualified employee" and affirming the district court's reversal of Civil Rights Commission award on disability discrimination claim).

Rumsey argues he is excused from proving this element of his disability-discrimination-based claims because Windsor did not assert it fired him for lack of temporary work. Rumsey relies on this reasoning to distinguish the line of cases holding an employer is not required to create a permanent position out of a temporary light-duty job it provides for an employee on a temporary basis. While Rumsey cites *Taylor v. Garrett*, 820 F. Supp. 933 (E.D. Pa. 1993), to support his position, he fails to provide any legal analysis explaining the difference that factual distinction makes. Our review of that case does not support Rumsey's position.

*Taylor* is a district court case denying summary judgment when an employee was terminated while working in a light-duty position after a work injury prevented him from continuing to work as a rigger. *Id.* at 939–40. In *Malabarba v. Chicago Tribune Co.*, the United States Court of Appeals for the Seventh Circuit, as have other courts, distinguished *Taylor* "in one very significant way—the plaintiff[] . . . [was] assigned to [a] permanent 'light-duty' assignment[], whereas Malabarba's 'light-duty' work assignment as a material handler was only temporary." 149 F.3d at 697 (emphasis omitted); *see also Sharpe v. Henderson*, No. CV–00–71–ST, 2001 WL 34039485, at *7 (D. Or. Oct. 19, 2001) (distinguishing *Taylor* on the same basis); *Copeland v. Chrysler Corp.*, No. 211109, 2000 WL 33553981, at *3 (Mich. Ct. App. Feb. 11, 2000) (per curiam) (same). The same is true here where the only evidence presented at trial made clear Windsor had no permanent light-duty positions, including the bead-taping position presented to the jury.

As explained above, in disability-discrimination-based claims, the employee carries the burden of first proving he is qualified, i.e., able to perform the essential functions of a permanent and vacant job. Rumsey's only response is that "[t]he jury could reasonably infer Defendants would

not have retained [Rumsey] if he were unqualified or could not physically perform his job." But the defendants' actions of providing a temporary light-duty position while Rumsey was rehabilitating his workplace shoulder injury as part of his worker's compensation claim does not satisfy Rumsey's obligation of identifying a permanent and vacant position he was qualified to perform, a necessary predicate for his disability discrimination claims.

Rumsey seems to be arguing that this is a mixed-motives case, not a direct-evidence failure-to-accommodate case, so that a different standard applies. Rumsey does not expand on this argument (or explain how a different standard would be applied), and we reject it. The reason Windsor terminated Rumsey becomes relevant only after Rumsey first establishes a prima facie case of disability discrimination or failure to accommodate, both of which include showing that he was a qualified individual. *See Casey's Gen. Stores, Inc.*, 661 N.W.2d at 525. Thus, unless he can show he was a qualified individual, the fact that he was terminated for a reason other than an ability to continue the work he was performing has no bearing on his disability discrimination claims.

An analogous situation can be seen in *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944. After a Pizza Hut store manager was seriously injured in a car accident, Pizza Hut promoted another shift manager as an interim comanager to perform some of her duties so she could continue working part time while recuperating. 188 F.3d at 947. Her doctor imposed restrictions of working no more than thirty-five to forty hours per week and no more than three consecutive days. *Id.* Despite glowing reviews prior to her accident, she was eventually terminated for performance reasons three weeks after her doctor determined she had reached maximum recovery. *Id.* at 947–48. She sued for disability

discrimination, and the district court granted summary judgment for Pizza Hut on the basis the employee failed to establish a prima facie case of disability discrimination. *Id.* at 948.

On appeal, the fact that Pizza Hut fired the manager for performance-based reasons rather than an inability to perform her job had no effect on the Eighth Circuit's analysis. Rather, the court considered whether the employee submitted sufficient evidence to create a fact issue on the elements of her prima facie case, including whether Pizza Hut could have reasonably accommodated her disability. *Id.* at 950–51. The Eighth Circuit concluded her request to make the comanager position permanent failed as a matter of law because Pizza Hut was not required to "create a permanent position out of a temporary one as an accommodation." *Id.* at 950. It reversed summary judgment, however, because Fjellestad had made a sufficient showing "and created a genuine issue of material fact" as to whether she could have performed another vacant position, identifying the shift manager position vacated by the interim comanager when she was permanently promoted to store manager. *Id.* at 950–51. "After Fjellestad made this facial showing that reasonable accommodation was possible, the district court should then have shifted the burden to Pizza Hut to prove that it was unable to accommodate Fjellestad through reassignment to this position." *Id.* at 951. That Pizza Hut did not claim it fired her because it could not accommodate her disabilities played no part in the court's analysis of whether the plaintiff met her burden to establish a prima facie case.

The same reasoning applies when an employer provides temporary light-duty tasks to accommodate an employee recuperating from work-related injuries and then fires the employee for reasons unrelated to his ability to perform the work. To establish a valid disability discrimination

claim, the employee must still present evidence that he was a qualified employee able to perform the essential functions of his job or another permanent vacant job. Rumsey failed to "make a facial showing that reasonable accommodation [wa]s possible," *id.* at 950, and Windsor was entitled to judgment as a matter of law on Rumsey's disability discrimination and failure-to-accommodate claims.

**C. Retaliation for Requesting a Sit-Down Accommodation.** Although we review the retaliation claim under a somewhat different legal analysis, we likewise conclude that Rumsey failed to present evidence to support submitting his retaliation claim related to the sit-down accommodation to the jury.

> The ICRA makes it
>
> an unfair or discriminatory practice for: . . . Any person to . . . retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.

Iowa Code § 216.11(2). The ICRA anti-retaliation provision is worded similarly to the ADA. *Compare id., with* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."). A prima facie case of retaliation under the ICRA requires the plaintiff to establish (1) he was engaged in statutorily protected activity, (2) he was subjected to an adverse employment action, and (3) a causal connection between his participation in the protected activity and the adverse

employment action. *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006).

Neither the ICRA nor the ADA identifies requesting an accommodation for a disability as protected activity. Yet, courts generally recognize that requesting a reasonable accommodation is protected activity that supports a retaliation claim. *See Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 908 (8th Cir. 2010) ("[A]lthough '[i]t is questionable' whether an employee who merely requests a reasonable accommodation 'fits within the literal language of the statute,' we are bound by *Heisler* [*v. Metropolitan Council*, 339 F.3d 622 (8th Cir. 2003)] to conclude that making such a request is protected activity for purposes of 42 U.S.C. § 12203(a)." (second alteration in original) (citation omitted) (quoting *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997))).

We have not directly addressed whether requesting an accommodation is protected activity under the ICRA. Assuming it is, the employee must still show his request for an accommodation was sufficiently related to a claimed disability so that the requested accommodation could be considered "lawfully oppos[ing] any practice forbidden under" chapter 216. Iowa Code § 216.11(2). This requirement keeps a retaliation claim within the confines of the statute, which prohibits retaliation only with respect to "any of the rights protected against discrimination by this chapter." *Id.* Thus, requesting an unreasonable accommodation, such as one not aimed at enabling the employee to perform the essential functions of a job, would not be considered opposing a practice forbidden by chapter 216.

Requiring Rumsey to prove, as part of his retaliation claim, that he requested an accommodation that would allow him to perform the essential functions of the job is also consistent with the jury instructions.

Instruction No. 21 required Rumsey to prove he "engaged in protected activity by requesting a reasonable accommodation for a disability," and Instruction No. 28 defined "a 'reasonable accommodation' [a]s a modification . . . which would enable a qualified individual with a disability to perform the essential functions of the position."

Federal courts recognize a similar limiting principle by requiring a good-faith belief that the requested accommodation was "appropriate" within the context of the ADA. *See Heisler*, 339 F.3d at 632 (" 'An individual who is adjudged not to be a "qualified individual with a disability" may still pursue a retaliation claim under the ADA' as long as she had a good faith belief that the requested accommodation was appropriate [under the ADA]." (citations omitted) (quoting *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 786 (3d Cir. 1998))). A request for an accommodation that clearly would not enable the employee to perform the essential functions of his job would not be reasonable, and therefore not appropriate, so there would no basis for finding that the employee was engaged in protected activity. *See Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 928 (11th Cir. 2019) (per curiam) ("Monroe's only purported protected activity was his request for indefinite leave. Because our caselaw was and is clear that a request for indefinite leave is not a reasonable accommodation, Monroe could not have had a good faith, reasonable belief that he was engaging in protected activity."); *see also Williams*, 190 F. Supp. 2d at 1122 n.15 ("[T]o the extent that Williams was requesting to remain on light-duty indefinitely, this was not a request for a reasonable accommodation. It is even more doubtful whether the ADA anti-retaliatory provisions would consider requesting unreasonable accommodations as 'protected activity.' " (emphasis omitted)).

Analogous to *Monroe v. Florida Department of Corrections*, our caselaw makes clear that an accommodation is not reasonable if it requires the employer to create a new position. *See Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521; *see also Schlitzer*, 641 N.W.2d at 530. As discussed above, the only position Rumsey identified that could be performed sitting down was the temporary light-duty work he performed at the bead-taping station. The request for a sit-down accommodation would have required Windsor to create a new position. Therefore, Rumsey cannot be said to have been engaging in the protected activity of opposing disability discrimination under the ICRA when he requested a sit-down restriction because that was clearly not a reasonable accommodation that would have enabled him to perform the essential functions of an available job.

Rumsey failed to establish he was engaged in statutorily protected activity under the ICRA, the first element of a retaliation claim, *see Boyle*, 710 N.W.2d at 750, and the district court should have granted a directed verdict in favor of the defendants with respect to his request for a sit-down accommodation.

**D. Claims Related to Rumsey's Hearing Impairment and Request for a Sign Language Interpreter.** Windsor does not dispute that Rumsey's hearing impairment is a disability. Rumsey filed his administrative claim with the Iowa Civil Rights Commission 295 days after he was terminated, so the only actionable conduct related to accommodating Rumsey's hearing impairment within the 300-day statutory period, *see* Iowa Code § 216.15(13), was Rumsey's request on December 15 for a sign language interpreter for the meeting with Crivaro.

In instructing the jury on each of Rumsey's theories of recovery, the court submitted Rumsey's request for a sign language interpreter together in the same instructions with his request for a sit-down accommodation,

as requested by the parties. Now that we have concluded the defendants are entitled to judgment as a matter of law on each claim premised on the request for a sit-down accommodation, it is difficult to parse out the claims related solely to the request for an interpreter. Unless the claims related to Rumsey's request for an interpreter also fail as a matter of law, remand for a new trial on those claims will be necessary. *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 710 (Iowa 2016) ("A new trial is required after a general verdict is returned for the plaintiff if the evidence was insufficient to submit one of several specifications of negligence."); *Erickson v. Wright Welding Supply, Inc.*, 485 N.W.2d 82, 86 (Iowa 1992) ("In civil cases, 'when a trial court errs in submitting even one of several theories of recovery and the jury returns only a general verdict for the plaintiff the verdict cannot stand and the defendant is entitled to a new trial.' " (quoting *Gordon v. Noel*, 356 N.W.2d 559, 565 (Iowa 1984))).

1. *Discrimination claim.* After Rumsey refused to sign the work restrictions without a sit-down restriction and after the meeting in Mallaney's office, Mallaney told Rumsey he would need to talk to Crivaro. Rumsey requested a sign language interpreter for that meeting because he had trouble keeping track of what everyone was saying in meetings with multiple people, so an interpreter made it easier to understand and to communicate. But Crivaro decided to terminate Rumsey based on Mallaney and Coppock's recommendation, so there was never a meeting that would have required an interpreter.

Rumsey claimed Windsor discriminated against him because he was hearing-impaired. To prove his discrimination claim, Rumsey was required to prove: (1) he had a disability, (2) he was qualified to perform the essential functions of the job, and (3) the circumstances of his termination raised an inference of discrimination. *See Goodpaster*, 849

N.W.2d at 6. Our determination that Rumsey failed to establish he could perform the essential functions of any available job at Windsor means he failed to establish a claim for discrimination under either claimed disability, including his hearing impairment.

2. *Failure-to-accommodate and retaliation claims.* Rumsey's request for an interpreter requires a different analysis. With respect to his failure-to-accommodate claim, a requested accommodation does not necessarily need to enable the employee to perform an essential function of his daily tasks to be a reasonable accommodation. *See, e.g.*, *EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1111 (9th Cir. 2010) ("UPS concedes that understanding and participating in mandatory departmental meetings are 'benefits and privileges of employment' . . . ." (quoting 29 C.F.R. § 1630.2(o)(1)(iii))). A jury could find that Rumsey's request for an interpreter for the meeting with Crivaro was a request for a reasonable accommodation. It was an important meeting, and evidence showed Rumsey had requested (and received) an interpreter for other similar meetings in the past.

Although the jury returned a verdict in Rumsey's favor on the failure-to-accommodate claim, the record does not reveal whether the jury based its verdict on the request for a sit-down instruction or the request for an interpreter. Likewise, the defendants were entitled to judgment if they established they would have made the same employment decision notwithstanding the requested accommodation. *See Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 272 (Iowa 2019) ("[I]n discrimination and retaliation cases under ICRA, we apply the *Price Waterhouse*[4] motivating-

---

[4]*Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989) (plurality opinion), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107(a), 105 Stat. 1071, 1075 (codified at 42 U.S.C. § 2000e–2(m) (1994)).

factor standard in instructing the jury and the defendant is entitled to an instruction on the same-decision defense recognized in *Price Waterhouse* if properly pled and proved."). As instructed, the jury had to consider whether Windsor would have made the same decision despite the request for both the sit-down restriction and the interpreter, but we cannot tell which basis the jury relied on for its verdict. Defendants are therefore entitled to a new trial on Rumsey's claim for failure to accommodate his request for an interpreter.

On remand, Windsor will have to prove it would have made the same decision even if it had not taken into account the request for an interpreter. *Id.* We note in remanding the case for a new trial that a failure-to-accommodate claim is not, as Rumsey argues, a strict-liability claim. *See Minnihan v. Mediacom Commc'ns Corp.,* 779 F.3d 803, 813 (8th Cir. 2015) ("There is no per se liability under the ADA if an employer fails to engage in the interactive process.").

Similarly, requesting a sign language interpreter for a meeting with HR could be considered protected activity for purposes of Rumsey's retaliation claim. *See Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (concluding "Kiel's requests for a [telecommunications device (TDD)] were protected communications" for purposes of a retaliation claim). The request for an interpreter is not per se unreasonable in the same way as the request for a sit-down restriction. Providing a sign language interpreter for an important meeting is akin to providing a ramp into the building for a wheelchair-bound employee. *See, e.g.,* Iowa Admin. Code r. 161—8.27(6)(*a*) (providing examples of reasonable accommodations to include "[m]aking facilities used by employees readily accessible to and usable by handicapped persons" and providing "readers or interpreters"); 42 U.S.C. § 12111(9) (same). A

retaliation claim focuses on protected activity, and the defendants do not dispute that, as a general matter, a hearing-impaired employee who requests an interpreter for an important meeting has engaged in protected activity.

Nonetheless, an employee who engages in terminable conduct cannot avoid the consequences of his actions by then requesting an accommodation for those actions. *See, e.g., Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) ("[L]iability is not established where 'an employee engages in misconduct, learns of an impending adverse employment action, and then informs his employer of a disability that is the supposed cause of the prior misconduct and requests an accommodation.'" (quoting *Schaffhauser v. United Parcel Serv., Inc.*, No. 4:12–cv–00599 KGB, 2014 WL 197684, at *10 (E.D. Ark. Jan. 15, 2014), *aff'd*, 794 F.3d 899 (8th Cir. 2015))); *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) (holding a request for an accommodation by a bus driver, after she fell asleep twice while on the job, was untimely because the request was made after she engaged in terminable misconduct).

The fighting issue on the retaliation claim is whether Rumsey established a causal connection between his participation in the protected activity and the adverse employment action. *See Boyle*, 710 N.W.2d at 750. We start with the proper standard for assessing that causal connection. We recently refined the standard in *Haskenhoff v. Homeland Energy Solutions, LLC*, where we held that "the motivating factor causation standard" applies to retaliation claims under the ICRA. 897 N.W.2d 553, 602 (Iowa 2017) (Cady, C.J., concurring in part and dissenting in part) (concurring with Appel, J., to "adopt the motivating factor causation standard" for retaliation claims under the ICRA); *see also Hawkins*, 929

N.W.2d at 271 (discussing *Haskenhoff* and explaining "[t]he motivating-factor standard is a lower standard than the determining-factor standard"). Part and parcel of the motivating-factor standard, the employer is allowed to then assert the same-decision affirmative defense. *Hawkins*, 929 N.W.2d at 272.

Rumsey relies heavily, indeed almost exclusively, on the timing of his termination to establish that his request for an interpreter was a motivating factor when he was terminated within hours after requesting an interpreter for the meeting with Crivaro. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel*, 169 F.3d at 1136; *see also Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997); *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346–47 (8th Cir. 1996). The defendants argue that Rumsey was terminated based on his insubordinate behavior, which would be sufficient to negate reliance solely on the temporal proximity of the protected activity to the termination. *See Kiel*, 169 F.3d at 1136 ("Insulting Ms. Fry and indulging in an angry outburst in the presence of co-workers, however, were certainly not [protected], for the ADA confers no right to be rude. Kiel's intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination."). The defendants' argument that requesting an accommodation following Rumsey's insubordinate conduct was too little too late is a valid legal position, but it relies on the jury finding that Rumsey was fired for engaging in insubordination, a finding apparently rejected by the jury as the case was presented to it.

In reviewing the sufficiency of the evidence following a jury verdict, we must construe the evidence in the light most favorable to the verdict.

*See Ludman v. Davenport Assumption High Sch.*, 895 N.W.2d 902, 909 (Iowa 2017) (" 'A directed verdict is required "only if there was no substantial evidence to support the elements of the plaintiff's claim." ' We 'view the evidence in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury.' " (citation omitted) (quoting *Pavone*, 801 N.W.2d at 487)). Here, Rumsey testified that he did not engage in the behavior claimed by Mallaney and Coppock. Leaving credibility determinations to the jury, the alleged insubordinate behavior cannot, as a matter of law, defeat the inferences from the temporal relationship between the request and the termination.

The record presented at trial provides only limited evidence to support a finding that Rumsey's request for a sign language interpreter motivated his termination. Rumsey focused on proving that his termination was motivated by his request for a sit-down restriction, which was the topic to be discussed at the meeting for which he requested the interpreter—the meeting that never happened. While characterizing the events differently, all parties presented significant evidence that Rumsey's termination was caused by the disagreement over his request for a sit-down restriction, whether by improper retaliation, as Rumsey claimed, or by Rumsey's insubordinate response, as the defendants claimed. Further, Rumsey admitted that Windsor had previously provided an interpreter when requested for similar meetings, lessening the plausibility of any inference that it was the request for an interpreter rather than the dispute over the sit-down restriction that motivated Rumsey's termination. *See Kiel*, 169 F.3d at 1136 (holding employee failed to present triable issue on claim employer terminated his employment in retaliation for his request for a TDD where "he had requested a TDD on numerous occasions, but he

suffered no adverse employment action until he engaged in abusive, derogatory conduct towards his employer").

Nonetheless, we cannot say as a matter of law that the jury could not have found that Rumsey's request for an interpreter was not a motivating factor in his termination. While temporal proximity is generally insufficient alone to establish the causal connection, Rumsey was fired within hours of requesting an interpreter for a meeting with Crivaro, a meeting that was cancelled after Rumsey was fired instead of being provided with the meeting and requested interpreter. Rumsey had also made clear to Coppock and Mallaney that he was going home and would not return for the meeting unless they got an interpreter, questioning their ability to provide one.

As the case was presented and instructed to the jury, we cannot tell whether the jury found retaliation based on the request for a sit-down restriction, the request for an interpreter, or both. As such, we must reverse and remand for a new trial, limited to Rumsey's failure-to-accommodate and retaliation claims related to requesting a sign language interpreter. *See Alcala*, 880 N.W.2d at 710; *Erickson*, 485 N.W.2d at 86.

**E. Individual Liability Under the ICRA.** The defendants are entitled to judgment on all claims except Rumsey's failure-to-accommodate and retaliation claims premised on requesting an interpreter. While both parties raised a number of additional issues on appeal, we need not address the other issues that are mooted or not likely to arise in the same manner in a new trial. The parties both raise claims related to damages, which are mooted by our opinion. Any damages awarded on remand will be assessed in light of the evidence presented at the new trial. The evidentiary issues raised by both parties involve discretionary calls by the trial court, and to the extent they may arise

again, admissibility of the challenged evidence will depend on its relevance to the remaining claims limited to the request for an interpreter. However, the issue of individual liability will arise again on retrial, so we address that issue.

Mallaney and Coppock argue that the district court erred in refusing to instruct the jury on their individual liability and provide a line on the verdict form separate from Windsor's liability. First, they ask us to limit individual liability under the ICRA to supervisory employees, which they define narrowly as those with final decision-making authority. Second, they argue that even if they could be subject to individual liability under the ICRA, their liability must be assessed independently of each other and of Windsor as Rumsey's employer.

Taking the issues in the reverse order, we agree individual liability must be assessed separately. Rumsey argues that the district court need not distinguish between Windsor and the individual defendants because Windsor can only act through its employees. While true, the opposite is not also necessarily true. Rumsey essentially argues for a reverse-vicarious-liability theory, which we reject, particularly where there is more than one individual defendant. An individual defendant facing liability under the ICRA is entitled to an individualized assessment of their liability and a separate line on the verdict form.

With respect to whether these individuals may be personally liable, we start with the premise that chapter 216 extends individual liability at least to supervisors, which we know from *Vivian v. Madison*, 601 N.W.2d 872, 872 (Iowa 1999) (answering a certified question from federal district court expressly limited to whether a supervisory employee could be subject to personal liability for employment discrimination under section 216.6). As we explained in *Vivian*, the Iowa general assembly's "use of the words

'person' and 'employer' in section 216.6(1), and throughout the chapter, indicates a clear intent to hold a 'person' subject to liability separately and apart from the liability imposed on an 'employer.' " *Id.* at 878. Our extension of liability to individuals who are not also the employer was supported by both the broad scope of chapter 216, *see id.* at 874 (discussing "section 216.18, which states that the chapter should be construed broadly to effectuate its purposes"), as well as the aiding-and-abetting provision of section 216.11(1), which indicated the general assembly intended chapter 216 liability to extend further than Title VII, which had no comparable provision, *see id.* at 873–74. We have not addressed individual liability under ICRA beyond *Vivian.*

Mallaney and Coppock ask us to limit chapter 216 liability to supervisory employees with decision-making authority over employment actions involving the plaintiff, relying on federal caselaw construing section 216.6. *See, e.g., Erickson–Puttmann v. Gill*, 212 F. Supp. 2d 960, 976 (N.D. Iowa 2002) ("The *Nelson* decision, and the Iowa Supreme Court's decisions underlying it, are in keeping with the express language of Iowa Code § 216.6(1)(*a*) which limits discriminatory acts to acts which imply that the actor has decision making authority over employment actions."); *Nelson v. Wittern Grp., Inc.*, 140 F. Supp. 2d 1001, 1009 (S.D. Iowa 2001) ("Before an individual may be found liable under Iowa civil rights law, he or she must be found to have 'control [of] the company's hiring decisions.' " (alteration in original) (quoting *Vivian*, 601 N.W.2d at 876)). Rumsey argues that individual liability applies broadly to "persons" when they in any way "discriminate in employment." *See* Iowa Code § 216.6(1)(*a*). As discussed below, individual liability is neither quite as limited as the defendants suggest nor as broad as Rumsey urges.

We start with the language of the ICRA, which makes it a discriminatory practice for

> [any p]erson . . . to discharge any employee, or to otherwise discriminate in employment against . . . any employee because of the . . . disability of such applicant or employee, unless based upon the nature of the occupation.

*Id.* The ICRA retaliation provision similarly makes it a discriminatory practice for

> [a]ny person to . . . retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter . . . .

*Id.* § 216.11(2). While the statutory language applies broadly to "any person," it also has limiting language. With respect to the failure-to-accommodate claim, the individuals must have "otherwise discriminate[d] in employment against . . . [the] employee," which means they must have engaged in discriminatory conduct that resulted in an adverse employment action. *Id.* § 216.6(1)(*a*); *see also Casey's Gen. Stores, Inc.*, 661 N.W.2d at 521. With respect to the retaliation claim, the individuals must have "retaliate[d] . . . in any of the rights protected against discrimination," which means they must have engaged in retaliatory conduct, in response to the plaintiff's protected activity, that materially and adversely injured or harmed the plaintiff. *Haskenhoff*, 897 N.W.2d at 582, 587–88 (quoting Iowa Code § 216.11(2) (2011)).

We reject the defendants' attempt to limit individual liability to supervisors. The "any person" language is not limited by title. While a supervisor may have the ability to alter the terms of a subordinate's employment, that is neither sufficient nor necessary to create liability. *See, e.g., Hill*, 737 F.3d at 1216 (holding supervisor who fired plaintiff was not individually liable under Fair Labor Standards Act for plaintiff's

complaint about failure to pay for accrued compensation time; although supervisor fired plaintiff, supervisor was not responsible for making compensation decisions following termination).    Rather, it is the individual's ability to effectuate the adverse employment action at issue that can subject them to personal liability.  *See Neppl v. Wells Fargo Bank*, No. 4:19–CV–00387–JAJ, 2020 WL 3446280, at *3 (S.D. Iowa Mar. 27, 2020) (construing "Iowa law [as] stating that a person must be in a position to effectuate an employment practice to be held liable" under Iowa Code section 216.6(1)(*a*)).  In *Neppl v. Wells Fargo Bank*, a former employee who had previously been terminated while on maternity leave applied for an open position with her former employer through a recruiter.  *Id.* at *1. When she was passed over for the position, she sued both the former employer and her former supervisor for violating the ICRA, alleging they retaliated against her for previously complaining about pregnancy and sex discrimination—the employer by failing to rehire her and the former supervisor by giving her a negative reference.  *Id.*  The district court granted the supervisor's motion to dismiss, concluding the plaintiff failed to allege the former supervisor "was in a position to control Wells Fargo's employment decision."  *Id.* at *3–4.  "Rather, a third party asked for her opinion, [the former supervisor] gave it, and the third party made the hiring decision."  *Id.* at 3.  Absent an allegation that the former supervisor had an ability to effectuate the adverse employment action, in that case the hiring decision, she could not be held individually liable.  *See id.*

This focus on the ability to effectuate the particular employment decision at issue is supported by *Sahai v. Davies*, involving a physician who performed a preemployment physical and recommended the employer not hire the pregnant applicant for a factory job.  557 N.W.2d 898, 900 (Iowa 1997) (en banc).  We held that the physician's recommendation did

not give rise to a claim of discriminatory conduct against him or his clinic under the "any person" language of section 216.6(1)(*a*). *Id.* at 901. Though the recommendation may have caused the prospective employer's decision not to hire the plaintiff, in the sense that the recommendation contributed to the decision, it was insufficient to hold the physician liable where the physician served only an advisory role. *See id.* The physician was not responsible for the hiring decision but was only asked to provide his independent medical judgment to assist the employer in making the hiring decision. *See id.* The employer was still responsible for the hiring decision. *See id.*

At the same time, we do not construe "any person" so strictly that it is limited to only those with final decision-making authority, as the defendants argue. The cases the defendants rely on are not as narrow as the defendants suggest. In *Nelson v. J.C. Penney Co.*, the district court granted summary judgment on a claim against the employer's general counsel where the evidence established only that the general counsel was present during the meeting when the decision was made to terminate the plaintiff and advised the decision-maker about potential legal problems from eliminating the plaintiff's position, but there was no evidence the general counsel "controlled the company's decision." *Nelson*, 140 F. Supp. 2d at 1010–11. That's not to say the individual had to have total control. It was the general counsel's " 'advisory' role, without more," that precluded individual liability. *Id.* at 1010 (quoting *Sahai*, 557 N.W.2d at 901).

To be liable, the individual must also be personally involved in conduct that alters the terms or conditions of the employee's employment. *See, e.g.*, *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006) (assuming without deciding that ICRA could impose liability on nonsupervisory coworkers but affirming summary judgment where

plaintiff failed to show coworker's conduct altered terms of plaintiff's employment). This approach is consistent with application of similar retaliation provisions in other states. *See, e.g., Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 984–85, 989, 992 (S.D.N.Y. 2017) (holding individual liability for retaliation under New York Executive Law section 296(6) may be imposed to the extent the individual was personally involved in prohibited conduct and allowing claim by general counsel of company against president of company who fired him after he complained to board of directors about president's racially discriminatory conduct but dismissing claims against coworkers absent allegations of coworkers' involvement in termination); *Martin v. Irwin Indus. Tool Co.*, 862 F. Supp. 2d 37, 38 (D. Mass. 2012) (rejecting coworker's assertion that retaliation provision in Massachusetts General Law chapter 151B, section 4(4) is limited to persons who exercise similar degrees of authority as employers as contrary to plain language of provision, making it unlawful for "any person . . . to discharge, expel or otherwise discriminate against any person because [she] has opposed any practices forbidden under this chapter" (alteration in original) (quoting Mass. Gen. Laws ch. 151B, § 4(4))); *EEOC v. Fred Fuller Oil Co.*, 134 A.3d 17, 18, 22 (N.H. 2016) (answering certified question as to whether employee can be individually liable under New Hampshire civil rights act and holding "any person who retaliates against another person in the workplace because he or she has taken any of the specified protected actions is liable, under [Revised Statutes Annotated of the State of New Hampshire section] 354–A:19, for an unlawful discriminatory practice"). The focus is not on the individual's title or generalized authority over employment decisions but on the individual's personal involvement and ability to bring about the challenged discriminatory action.

We conclude that an individual who is personally involved in, and has the ability to effectuate, an adverse employment action may be subject to individual liability for discrimination under section 216.6 or retaliation under section 216.11(2), assuming the other elements of each claim are satisfied with respect to the individual defendant. Whether an individual has the requisite involvement and ability to effectuate the challenged adverse action will depend on the facts of the particular case.

We reject Mallaney's and Coppock's argument that they are entitled to judgment as a matter of law on the basis that neither had final decision-making authority to terminate Rumsey. That said, we express no judgment on the viability of the claims remaining in this case related to the request for an interpreter against either Mallaney or Coppock. On remand, the trial court should have the opportunity to apply the standard set in this case in the first instance.

Whether Mallaney or Coppock are individually liable must be based on findings by a jury that each of them was sufficiently involved in, and had the ability to effectuate, the challenged adverse action. If the individual defendants remain in the case for trial, then they are entitled to appropriate jury instructions and separate lines on the verdict form.[5]

---

[5]To that end, we acknowledge Judge Bennett's warning that the litigation strategy of naming individual defendants alongside a corporate employer is a risky one. *See Blazek v. U.S. Cellular Corp.*, 937 F. Supp. 2d 1003, 1027 n.9 (N.D. Iowa 2011) ("I question the wisdom of plaintiffs routinely naming individual defendants in employment discrimination cases, even if they can allege a plausible factual basis for doing so. . . . When the day of reckoning approaches, the vast majority of plaintiffs' lawyers recognize the substantial risk that even if they win, juries will find against the individual defendants and either exculpate the alleged corporate wrong-doer or allocate most if not all of the damages to the individuals who are often judgement proof."). This may explain the dearth of cases holding an individual liable under chapter 216.

**IV. Conclusion.**

The defendants are entitled to judgment as a matter of law on each of Rumsey's disability discrimination claims except Rumsey's claims for failure to accommodate and retaliation premised on his request for a sign language interpreter. The district court's denial of the defendants' motion for directed verdict is reversed as to each of Rumsey's other claims, and the case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**